NO. 07-08-0434-CR
NO. 07-08-0435-CR
NO. 07-08-0436-CR
NO. 07-08-0437-CR
NO. 07-08-0438-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

OCTOBER 29, 2009

_____

JOE MARVIN SLUTZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NOS. 58,571-E, 58,572-E, 58,573-E, 58,574-E, & 58,575-E;
HONORABLE DAVID GLEASON, JUDGE[1]

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Following pleas of not guilty, Appellant, Joe Marvin Slutz, was convicted by a jury

of six separate offenses and assessed the corresponding punishments: (1) Cause No.

---

[1]David L. Gleason, (Ret.), sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(3) (Vernon 2005).

58,571-E, sexual assault of a child–twenty years confinement; (2) Cause No. 58,572-E, Count I–aggravated sexual assault of a child–confinement for life; Count II–aggravated sexual assault of a child–confinement for life; (3) Cause No. 58,573-E, aggravated sexual assault of a child–confinement for life; (4) Cause No. 58,574-E, aggravated sexual assault of a child–confinement for life; and (5) Cause No. 58,575-E, aggravated sexual assault of a child–confinement for life. The trial court ordered the life sentences in Count I and Count II of Cause No. 58,572-E to run concurrently; the twenty year sentence in Cause No. 58,571-E to run consecutive to the sentence in 58,572-E; the life sentence in Cause No. 58,573-E to run consecutive to the sentence in 58,571-E; the life sentence in Cause No. 58,574-E to run consecutive to the sentence in 58,573-E; and the life sentence in Cause No. 58,575-E to run consecutive to the sentence in 58,574-E.

## Factual Background

In 2005, Appellant became acquainted with the victim, Jonathan, and his mother, Tara, when Jonathan was 12 years old. Jonathan had lived most of his life without a father-figure and Appellant sought to fill that role. He helped Jonathan's mother by giving Jonathan rides to school and doing other favors. He was added as an emergency contact at Jonathan's school and he allowed Jonathan to use a spare bedroom in his house from time to time. Jonathan also did odd jobs for Appellant in exchange for gifts.

During the Christmas season in 2006, Appellant and Jonathan went to a Christmas tree lot operated by Troop 80 of the Boy Scouts of America. Jonathan expressed to Appellant an interest in joining the scouts program and, in January 2007, they pursued the

2

idea with Douglas Walker, the Troop 80 committee chairperson. Jonathan immediately joined and Appellant joined the next month as an assistant scoutmaster. According to Walker, Appellant gave the impression that he was Jonathan's stepfather and never indicated otherwise.

One of the first scouting events Appellant and Jonathan attended was swim night at an indoor pool. Appellant changed clothes in the boys locker room. After Appellant was informed that there was a separate locker room for adults, he nevertheless disrobed, walked around naked, and showered in the boys locker room. According to the testimony of several witnesses, the boys felt that Appellant was observing them as they showered.

Over the course of the next few months, some of the scouts and adult volunteers observed behavior by Appellant toward other scouts, which although not illegal, did violate troop policy.[2] Although the evidence showed that Appellant did not receive a policy or procedure manual, the application he signed to join as an assistant scout master contained information regarding the Boy Scouts of America youth protection policy. Walker also spoke to Appellant about the youth protection policy after Appellant would not leave the boys' tent during a camping trip. At a scouting event in the summer of 2007, a teenage scout patrol leader observed Appellant pull another teenage scout onto his lap and rub his chest. The patrol leader reported the conduct to a scoutmaster. Other adult volunteers also observed the incident and became alarmed. Thereafter, steps were immediately

---

[2]Some of the inappropriate conduct testified to by several witnesses included the swim night incident, Appellant having teenage scouts remove their shirts during a shooting range exercise and putting his arms around them during lifeguard certification. A strict policy of the Boy Scouts of America is two-deep leadership which prohibits one-on-one contact, with the exception of that leader's son.

3

taken to remove Appellant as an assistant scoutmaster, and he was instructed not to contact any scouts. According to scoutmaster James Spencer, Appellant reacted to his expulsion lightly, laughed, and informed Spencer that a scout named Christian would have to come by his house and "pick up his stuff."[3]

Jonathan eventually left the scout program. He was not a model student and he suffered from behavioral problems in middle school. According to Glenda Utsey, the liaison officer for Jonathan's school cluster, he engaged in fighting, had poor attendance, and frequent office referrals. He was not, however, a major offender.

In early September of 2007, after Appellant had been expelled from Troop 80, Jonathan's mother called Spencer to report that Jonathan was upset, crying, and would not talk to her. She asked him to speak with Jonathan. Accompanied by another representative of Troop 80, Spencer went to Jonathan's house one evening to speak with him. Jonathan had invited a close friend of his, Robert, to be there that evening.[4] According to Spencer, Jonathan was nervous, anxious, upset, and very embarrassed, but eventually confided in him that Appellant had sexually abused him. They talked until 1:30 the next morning.

Jonathan revealed to Spencer that he and Appellant had engaged in oral sex, Appellant had anally raped him, and Appellant had watched him while he showered. Jonathan also claimed that Appellant threatened to hurt him if he told anyone about the

---

[3]According to the record, Christian is the son of Appellant's girlfriend.

[4]Spencer did not know Robert and he was not a boy scout.

4

abuse.[5] Spencer recommended to Jonathan's mother that she get him some professional help in the form of counseling. According to Spencer, Jonathan's mother sought financial assistance from the State for counseling but was unsuccessful due to "political stuff." He then recommended an attorney she should consult who might be able to help.

After speaking with Jonathan, Spencer contacted Detective Jeff Higley of the Amarillo Police Department. He was assigned to investigate the case on September 5, 2007. To gather evidence, Detective Higley arranged for a single party consent call to be made by Jonathan to Appellant.[6] Guided by Detective Higley, Jonathan had the following telephone conversation with Appellant:

[Jonathan]:   I'm kind of scared.

[Appellant]: Why?

[Jonathan]: I told Robert about you touching and sucking my dick, and he told my mom. She wants me to go take . . . talk to . . take me up to talk to the cops.

[Appellant]: Figures.

[Jonathan]:   What should I tell them.

\*   \*   \*

[Jonathan]:   What will happen to you if I tell them what you did?

\*   \*   \*

---

[5]Jonathan testified to at least two instances of Appellant striking him with his vehicle and one incident during a hunting trip in which Appellant fired a rifle shot near him while saying, "piss me off and I'll make it look like an accident." He also testified to Appellant punching him in the chest.

[6]A single party consent phone call is one in which one of the parties, but not both parties, have consented to the call being recorded. If properly authenticated, single party consent phone calls are admissible in evidence. *See generally* Tex. Code Crim. Proc. Ann. art. 18.20 (Vernon Supp. 2009).

[Jonathan]: I don't know . . . . Did you do that to Robert, too?

[Appellant]: I think so . . . once. But, that's between Robert and me. Course, now it's between you and me. I don't know. Maybe I should go to prison and die. That would be a good thing.

[Jonathan]: Why'd you do that to me?

[Appellant]: Why did you do it to me?

[Jonathan]: I never did it to you.

[Appellant]: *laughs* OK . . . alright. I don't know. Suppose I . . . I suppose you could, uh, change the time frame, that it happened while I was, uh, you know, having back surgery and under. Cause a lot of people came to visit me, and I don't remember anybody. I remember you and [A]. I don't remember any of the rest . . . . You could just deny it, it's up to you. . . .

\* \* \*

[Jonathan]: What would happen to you if I told them?

[Appellant]: I don't know. Lose my business, go to prison. . . .

[Jonathan]: Have you done it to anybody else?

[Appellant]: No.

[Jonathan]: Just me and Robert.

[Appellant]: Yeah. And I don't know why I did that since then either. Maybe cause it's been so long since I had [my wife]. Been two years now.

The transcript was read to the jury during Detective Higley's testimony.

On September 10, 2007, Appellant was asked to come to the police station for an interview. When Detective Higley confronted him with the recorded phone call, he laughed. He gave a written statement in which he claimed to be nothing more than a "fill-in Dad," and denied having any sexual contact with Jonathan.

6

On September 21, 2007, Jonathan's mother filed a civil lawsuit against Appellant on Jonathan's behalf. She alleged that Appellant coerced Jonathan into an "inappropriate homosexual relationship" and sought actual and punitive damages for various complaints including, but not limited to, sexual offenses and intentional infliction of emotional distress.

A year after the civil suit was filed, Appellant gave his deposition on September 17, 2008.[7] During the criminal trial, the State sought to have Exhibits 2 and 3, both excerpts from Appellant's civil deposition, introduced into evidence. Based on an extraneous offense contained in the deposition, defense counsel strenuously lodged relevance objections and objections pursuant to Rule 404(b) of the Texas Rules of Evidence.[8] The trial court admitted both exhibits and the excerpts were read to the jury.

As the excerpts were read, the jury heard denials from Appellant regarding any inappropriate conduct with Jonathan. In fact, Appellant accused Jonathan of inappropriately touching him. When questioned whether he had ever had sexual contact with other males, Appellant answered, "I would say yes, but that's really none of anybody's business but mine." Appellant then alluded to sexual experimentation being something all males do. The deposition continued:

---

[7]The civil suit was eventually non-suited.

[8]The State contends that Appellant waived any complaints regarding Rule 403 by failing to object on that basis. Part B of Appellant's Motion in Limine, entitled Extraneous Offenses, does request that the trial court weigh the probative value of extraneous offenses against their unfair prejudice. Although a motion in limine normally preserves nothing for appellate review, *Gonzales v. State,* 685 S.W.2d 47, 50 (Tex.Crim.App. 1985), during trial, defense counsel did "reurge" his motion in limine in response to the objectionable testimony. In the interest of justice, we conclude any arguments based on Rule 403 were preserved for review. *See* Tex. R. App. P. 33.1(a).

Q.     Have you ever had homosexual sex with another male?

A.     No, sir.

Q.     Okay.  And by that, I would include oral sex, anal sex –

A.     Oh, well, oral – oral, yes.

Q.     Okay, Have you ever had oral sex with – as an adult with a child?

A.     No, sir.  Oh, well, other than with [Robert], and that's none of your business either, but –

Q.     Who's [Robert]?

A.     That's a friend of [Jonathan's].

Q.     Okay.  So you had oral sex with [Robert]?

A.     Uh-huh.

*     *     *

Q.     When was this that you had oral sex with Robert?

A.     Right after I had back surgery.

Q.     And when was that?

A.     I think it was in May of 2007.

Q.     How old was [Robert] at the time?

A.     Fourteen.

Appellant again denied any inappropriate sexual conduct with Jonathan.

Before Jonathan was called to testify during the criminal trial, the State called Robert to the stand.  Defense counsel reurged his motion in limine objections (Rule 404(b) and Rule 403), and the trial court instructed the parties to approach before violating the motion

8

in limine. The State expressed its intent to question Robert about what he told Spencer the night Spencer visited Jonathan's house.

During his testimony, Robert claimed he did not disclose specifics to Spencer about Appellant's conduct and just told him that "stuff that had gone on" because he did not know Spencer and felt uncomfortable telling him things. He did, however, testify that he told Spencer Appellant would make him take his clothes off and shower while he washed his clothes. Oftentimes, the laundry was not done until the next day and he would sit around Appellant's house naked. Some times Appellant was also naked.

Jonathan testified after Robert. According to Jonathan, his relationship with Appellant became "weird" in 2006. Appellant began "touching, feeling, taking off his shirt and sitting me on his lap." The two began engaging in oral sex and according to Jonathan, about a month later, Appellant's conduct escalated to anal rape. Jonathan testified that the threats made by Appellant began after the anal assaults started. Jonathan also described an incident while he was in the shower in which Appellant got in with him and washed him and touched his private parts.

The final witness to testify for the State was Becky O'Neal, the SANE examiner. According to her testimony, Jonathan was extremely uncomfortable with the exam and had poor eye contact throughout. Jonathan reported that the abuse began in sixth grade and continued through eighth grade. He claimed to have been anally raped 75 times. O'Neal did not find any evidence of trauma to Jonathan's body; however, the exam showed that Jonathan had suffered multiple penetration of the anus which wore down the area and

9

healed in the form of a scar. She concluded that Jonathan's story was consistent with the results of her exam.

After the State rested, the defense offered its only exhibit in the form of Plaintiff's Original Petition in the civil suit filed by Jonathan's mother. No other evidence was offered and the defense rested.

**Analysis**

By a sole issue, Appellant contends the trial court abused its discretion in admitting extraneous evidence of him assaulting another child. Specifically, Appellant's complaints are directed at the trial court's admission of Appellant's deposition excerpts (State's Exhibits 2 and 3) and the testimony of Robert. These errors, he maintains, caused him harm due to the severity of his cumulative sentences. We disagree.

### I.       Standard of Review–Admissibility of Evidence

We review a trial court's ruling admitting evidence for abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g)). A trial court abuses its discretion when its decision is outside the zone of reasonable disagreement. *Green v. State*, 934 S.W.2d 92, 102 (Tex.Crim.App. 1996). Otherwise we are required to uphold a trial court's admissibility decision. *Montgomery*, 810 S.W.2d at 391.

## II.     Extraneous Offense Evidence

Rule 404(b) of the Texas Rules of Evidence provides that extraneous offense evidence is not admissible to prove the character of a person in order to show action in conformity therewith. Tex. R. Evid. 404(b). However, it is not rendered inadmissible if the extraneous offense evidence is relevant to a fact of consequence apart from its tendency to show conduct in conformity with character. *Johnston v. State*, 145 S.W.3d 215, 221-22 (Tex.Crim.App. 2004).

Rule 403 provides in part that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Relevant evidence is generally admissible. Tex. R. Evid. 402. In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission in close cases. *Casey*, 215 S.W.3d at 879.

For extraneous offense evidence to be admissible under both Rule 404(b) and Rule 403, that evidence must satisfy the following two-prong test:

- Is the extraneous offense evidence relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character?
- Is the probative value of the evidence sufficiently strong so that it is not substantially outweighed by unfair prejudice?

*See Johnston*, 145 S.W.3d at 220.

11

"Probative value" refers to the inherent probative force of an item of evidence–that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation–coupled with the proponent's need for that evidence. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex.Crim.App. 2006). "Unfair prejudice" refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Id.* Only unfair prejudice provides the basis for exclusion of relevant evidence. *Montgomery*, 810 S.W.2d at 389.

In our review, we presume that probative value substantially outweighs the danger of unfair prejudice. *Id.* Thus, the defendant bears the burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value of evidence. *Poole v. State*, 974 S.W.2d 892, 897 (Tex.App.–Austin 1998, pet. ref'd). In reviewing a trial court's Rule 403 ruling, we are to reverse the judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex.Crim.App. 1999).

### A.      Rule 404(b)

In support of offering excerpts of Appellant's deposition and the testimony of Robert, the State relied on *Powell v. State*, 63 S.W.3d 435 (Tex.Crim.App. 2001). In *Powell*, the Court reversed the appellate court's decision reversing the trial court for abusing its discretion in admitting extraneous offense evidence. *Id*. at 436. At trial, the defense presented its theory during its opening statement that the defendant could not have molested the child victim because of the presence of his daughters and others who slept in the living room. *Id.* at 436-37. This theory was also advanced during cross-examination

of the victim. The victim testified that she was never alone with the defendant. During its case-in-chief, the State contravened the defensive theory with four witnesses who testified that the defendant had molested them under almost identical circumstances as the charged offense. *Id.* at 437.

The defense presented testimony from dozens of girls who spent the night at the defendant's house without anyone being molested. *Id.* The State then rebutted that evidence with two additional witnesses who testified similar to the four who had already testified during the State's case-in-chief. *Id.* On appeal, the defendant argued the trial court erroneously admitted the testimony of the State's six witnesses because their testimony was admitted solely for the purpose of character conformity, to-wit: the defendant is a child molester. *Id.*

The relevant inquiry under the facts of *Powell* was whether the evidence was admissible for its non-character conformity purpose. *Id.* at 439. Such evidence was admissible to rebut a defensive theory which gave the evidence relevance apart from character conformity. *Id.* The *Powell* Court added that the trial court's limiting instruction clearly showed the evidence was admitted for its non-character conformity purpose. *Id.*[9]

Some years after *Powell*, the Court decided in *Bass v. State*, 270 S.W.3d 557, 563 (Tex.Crim.App. 2008), that case law supports a decision that a defense opening statement may open the door to the admission of extraneous offense evidence to rebut the defensive

---

[9]The Court disagreed with Judge Johnson's concurring opinion that because an opening statement is not evidence, it is never within the trial court's discretion to admit extraneous offense evidence to rebut a defensive theory raised in an opening statement. *Powell*, 63 S.W.3d at 439-40.

13

theory presented in the defense opening statement.[10]  In *Bass*, defense counsel alleged in his opening statement that the victim's allegations of molestation were "pure fantasy" and "pure fabrication."  *Id.* at 557.  Defense counsel continued that the allegations were contrary to the defendant's character because he was a pastor and minister; "he is the real deal and the genuine article."  *Id.* at 558.  During its case-in-chief, the State was permitted to present extraneous offense evidence of other girls who had been molested in the defendant's church office.  *Id.* at 558-59.

Bass complained on direct appeal that the extraneous offense evidence was inadmissible under Rule 404(b) because it was offered solely for the purpose of character conformity.  *Id.* at 562.  The appellate court held the trial court abused its discretion in admitting the evidence to rebut a "fabrication" defense even though the evidence would have been admissible to rebut a "frame-up" or "retaliation" defense.  *Bass v. State*, 222 S.W.3d 571, 575-78 (Tex.App.–Houston [14th Dist.] 2007).  Finding no categorical distinctions between "fabrication" defenses and "frame-up" or "retaliation" defenses, the Court of Criminal Appeals concluded the trial court did not abuse its discretion in admitting the extraneous offense evidence to rebut the defensive theory of fabrication and reversed the appellate court.  *Bass*, 270 S.W.3d at 563.

In the instant case, the defense made its opening statement immediately after the State's opening statement.  Defense counsel recalled the movie "Wall Street" and quoted

---

[10]When the defense chooses to make an opening statement immediately after the State's opening statement, the State may reasonably rely on this defensive opening statement as to what evidence the defense intends to present and rebut the anticipated defensive evidence during its case-in-chief as opposed to waiting until rebuttal.  *Bass*, 270 S.W.3d at 563 n.7.

14

the main character saying, "greed is good, greed is the American way." Counsel continued with his defensive theory that Jonathan's allegations against Appellant were motivated by money. Counsel then mentioned the civil lawsuit for monetary damages to which the State objected as being improper opening argument. The trial court overruled the State's objection and defense counsel continued to talk about the civil lawsuit. "The evidence is going to show in this case that shortly after the Boy Scouts said [Appellant] get out, that an opening was seen, a chance to get money was seen." Counsel then suggested that Jonathan's allegations worsened as the civil lawsuit progressed. In his closing argument, defense counsel reiterated the theory that the civil lawsuit for damages was the motive behind the allegations Jonathan made against Appellant.

The defense waved the lawsuit in the face of the jury during opening argument, yet vehemently objected during trial when the State offered excerpts from Appellant's civil deposition. Under *Bass*, the defense opening statement opened the door to admission of extraneous offense evidence. 270 S.W.3d at 558. The defense was theorizing that Jonathan fabricated the allegations against Appellant. By offering the excerpts from Appellant's deposition in which he admitted to performing sexual acts with Robert, and by offering Robert's testimony that "stuff had gone on" with Appellant, the State was attempting to show that Appellant's claim of fabrication-for-money defense was less probable. By showing that the allegations were less likely to be fabricated, the extraneous offense evidence directly rebutted Appellant's defensive theory and had logical relevance apart from character conformity. *Id.* at 562-63.

15

Additionally, the trial court gave the jury the following limiting instruction in all five charges:

> [Appellant] is on trial solely on the charge contained in the indictment. In reference to evidence, if any, that [Appellant] has previously participated in recent transactions or acts, other than that which is charged in the indictment in this case, you are instructed that you can not consider such other transactions or acts, if any, for any purpose unless you find and believe beyond a reasonable doubt that [Appellant] participated in such transactions or committed such acts, if any; and even then you may only consider the same for the purpose of determining intent or knowledge or motive or opportunity or preparation or plan or identity or absence of mistake or accident, if it does, and for no other purpose.

Appellant relies on *Daggett v. State*, 187 S.W.3d 444 (Tex.Crim.App. 2005), in which the Court found error in the admission of extraneous offense evidence which was similar to the charged offense and reversed the case and remanded it for a harm analysis. *Daggett*, however, involved the "plan" exception to the admission of extraneous offense evidence and not evidence to rebut a defensive theory. Additionally, the court's limiting instruction in *Daggett*, when considered with the State's closing argument, improperly permitted the jury to consider the challenged evidence for its substantive value. We choose to apply *Bass*, a more recent pronouncement from the Court of Criminal Appeals, which permits the admission of extraneous offense evidence to rebut the defensive theory of fabrication. 270 S.W.3d at 562-63.

We conclude that the extraneous offense evidence had relevance apart from character conformity. Thus, we must now evaluate the evidence under Rule 403 to see if its probative value outweighed its prejudicial effect.

16

**B.    Rule 403**

While evidence may be admissible under Rule 404(b), the trial court may exercise its discretion to exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *Moses v. State*, 105 S.W.3d 622, 626 (Tex.Crim.App. 2003). The trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted. *See Casey*, 215 S.W.3d at 879.

Based on a review of the entire record, we find the deposition excerpts and Robert's testimony were strongly probative to rebut the defensive theory that Jonathan fabricated the allegations. Thus, as proponent of the evidence, the State established a need for the evidence. Although the evidence could have had a tendency to suggest conviction on an improper basis, the trial court properly instructed the jury on the limited purpose for which the extraneous offense evidence was admitted. The evidence was not the sort that would have caused confusion or distraction of the main issue. Finally, Robert's testimony was very brief compared to that of eight other witnesses, and the reading of the two deposition excerpts which amounted to approximately sixteen pages of text from a record containing

17

multiple volumes and hundreds of pages did not consume an inordinate amount of time. Viewing the totality of the factors, we conclude the trial court did not abuse its discretion in admitting the challenged extraneous offense evidence. Appellant's sole issue is overruled.

## Conclusion

The trial court did not abuse its discretion in admitting State's Exhibits 2 and 3 and the testimony of Robert to rebut Appellant's defensive theory that Jonathan had fabricated the allegations against him for financial gain from a civil lawsuit.

Consequently, the trial court's judgments are affirmed.

Patrick A. Pirtle
Justice

Do not publish.