COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MICHAEL WILLIAM WELLS, | § | No. 08-07-00064-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 59th Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | | of Grayson County, Texas |
| | § | |
| Appellee. | | (TC# 051408-T) |
| | § | |
| | § | |

**O P I N I O N**

This is an appeal from three felony convictions of aggravated sexual assault of a child.
Appellant was convicted under three indictments by the jury. He was sentenced by the trial court
to 45 years confinement with the Institutional Division of the Texas Department of Criminal
Justice. On appeal, Appellant raises two issues arguing the trial court erred in failing to exclude
outcry testimony as hearsay and in allowing testimony of an extraneous offense.[1] We affirm.

In Cause No. 51406, Appellant was charged with intentionally or knowingly causing the
penetration of the female sexual organ of R.C., a child under the age of fourteen, with his finger.
In Cause No. 51407, Appellant was charged with touching the genitals of C.W., a child under the
age of 17, with the intent to sexually arouse and gratify himself. In Cause No. 51408, Appellant

---

[1] This is the first of three identical opinions for the companion cases before the Court,
which all raise the same issues. *See Wells v. State*, 08-07-00062-CR (Tex.App.--El Paso
April 23, 2009, no pet.h.) and *Wells v. State*, 08-07-00063-CR (Tex.App.--El Paso April 23,
2009, no pet.h.).

was charged with intentionally and knowingly penetrating the female sexual organ of C.W., a child under the age of fourteen with his finger.

Officer Jack Melson testified that R.C. was brought in by her grandmother with reported allegations of sexual abuse in August of 1997. R.C. told Officer Melson that her stepfather, Mr. Wells, had sexually assaulted her. After getting out of the bathtub, R.C. complained to her stepfather that it was hurting when she went to the restroom. He told her to go get on the bed and get on her hands and knees. He then put his finger in her. Officer Melson stated R.C. had told her of another incident after they had left Sherman, TX. Defense counsel objected on the basis of hearsay, but was overruled by the trial court. R.C. said that Mr. Wells told her he was going to take her to a cemetery and have sex with her. However, she started crying and told him to take her home, which he did. The county attorney did not pursue the case because the victim no longer wished to proceed.

R.C. testified at trial as well. R.C. testified to the same events as Officer Melson. She stated that she used to get urinary tract infections, and one night after she got out of the bathtub, she told her stepfather about it, and he had her get on her hands and knees on top of the bed. He put his finger inside of her, but she told him to stop. R.C. also testified that when she was fifteen he told her he was going to take her to the cemetery, turn her over the hood, and "pop her cherry."

R.C. also testified that her sister C.W. had come to stay with her at her home, and had told her some things that Appellant had done to her. C.W. had told her that he would make her watch adult videos, tried to penetrate her, and would "touch her down there." R.C. told her mother about it, who said she would handle it, but R.C. eventually called the district attorney and

Sherman Police Department. On cross-examination, defense counsel solicited testimony that R.C. and her grandmother were upset with Mr. Wells, and made up the allegations of sexual assault.

C.W. testified that when she was eleven, she was watching television with Appellant when he put his hands on top of her "private area" and rubbed her. She testified to another incident where he pulled over while they were driving home, and walked out into the woods and had her perform oral sex on him. C.W. also testified that Appellant would have her watch dirty movies and masturbate him. C.W. stated that Appellant had tried to have sex with her, but she told him no and started to cry so he stopped. C.W. stated that on more than one occasion, Appellant put his finger inside of her. On cross-examination, defense counsel questioned her about being angry with her mother and Appellant for lying to her about Appellant being her biological father.

L.S. testified that she knew Mr. Wells because he was married to her aunt. When she was fourteen or fifteen, she went into the bedroom and laid down beside him, and Mr. Wells attempted to put his hand down her pants. She pushed him off and told him no. On cross-examination, defense counsel questioned L.S. about meeting with her cousins, R.C. and C.W., before any police report was filed and discussing the incidents.

Defense counsel called one witness, Joanna Wells, mother of Appellant. Ms. Wells stated she had spoken with C.W. about the allegations she had made. She had asked C.W. why she had not told the truth, and C.W. responded if she had then they would know she had lied. Ms. Wells stated that C.W. has a problem telling the truth, and is a very good liar.

In Issue One, Appellant argues the trial court erred in allowing Officer Jack Melson to

-3-

testify to hearsay statements made by R.C. because no written notice or summary of the statements were filed or provided to defense counsel. The State argues error was not properly preserved, and we must agree. Appellant made no objection to the description of the initial sexual abuse, and only a general hearsay objection to the statements regarding other occurrences. Appellant did not object on the grounds of failing to comply with the notice requirements under Article 38.072. TEX.CODE CRIM.PROC.ANN. art. 38.072 (Vernon 2005). Appellant has not preserved this issue for review. TEX.R.APP.P. 33.1(a); *see Garcia v. State*, 907 S.W.2d 635, 637 (Tex.App.--Corpus Christi 1995), *aff'd*, 981 S.W.2d 683 (Tex.Crim.App. 1998); *Aaron v. State*, 2008 WL 2426667 at *1-2, (Tex.App.--Dallas, June 17, 2008, no pet.)(not designated for publication). Issue One is overruled.

In Issue Two, Appellant argues the trial court erred in admitting testimony and evidence of an extraneous offense committed by Appellant against a third party because the offense was not properly proven and the evidence is not relevant to a material issue in the case other than to show the defendant's character. The State argues the extraneous offense evidence was properly admitted because it rebuts a defensive theory raised by Appellant.

The admission of extraneous offenses is reviewed for abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003). We must uphold the trial court's decision to admit evidence as long as it falls within the zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 889 (Tex.Crim.App. 2002); *Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex.Crim.App. 1991). Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. TEX.R.EVID. 404(b). Extraneous offense evidence may be admissible, however, when it has relevance beyond

-4-

character conformity to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R.EVID. 404(b). Rebuttal of a defensive theory is one of the purposes for which relevant evidence may be admitted under Rule 404(b). *Moses*, 105 S.W.3d at 626. Evidence of an extraneous offense is admissible to rebut a defensive theory of "fabrication" or "frame-up," where the defendant has opened the door to its admission. *Bass v. State*, 270 S.W.3d 557, 563 (Tex.Crim.App. 2008).

The Defense delivered its opening argument immediately after the State. During opening statements, the defense counsel stated:

> I think you're going to hear there were problems going on in the family, and I think that you're going to hear those allegations came up and then they were withdrawn.
> What I think you're further going to hear is that, again, in 2003 that additional problems in the family came up and now you have two daughters that make remarkably similar allegations, and it points along the way those allegations were withdrawn. I think you're going to hear evidence of that, and that these are allegations that are put out there and withdrawn and put out there and then withdrawn following the cycle of how Mr. Wells and his wife at the time were getting along.
> And what I think you're going to see is the driving force behind each and every allegation is, is [sic] Laverne Archie, the mother of Mr. Wells' wife, and that she is the one who always brings these allegations to the forefront. And I think you're going to hear that she has very serious reasons, motive, and bias to push these children to make these statements about Mr. Wells. But what you need to pay particular attention to is the overall inconsistency of the statements made by these children, that they do not stick to their guns, that they do not stick to the story, and that this is a well-orchestrated brought about event.

In the defense's case-in-chief, they called only one witness, Joanna Wells. Ms. Wells questioned C.W. about lying about the allegations, and C.W. responded that if she told the truth then they would know she was lying. During closing argument, defense counsel stated:

> Now, six years elapsed. Now, we know from R.C.'s testimony she runs away with a boyfriend as the family is moving to College Station. She finds out

while she's run away that the family has moved off to College Station and she's mad and she's upset and she's angry and she's hurt and she goes to her grandmother who's -- there's been some evidence has a problem with Mr. Wells, and suddenly what was Mr. Wells examining her for a urinary tract infection six years later at 15 now has become a sexual assault.

And then there's also the story thrown in about going to the cemetery or threatening to go to the cemetery, but if you listen to what was said, nothing ever actually took place. She never said he took her to a cemetery and had sex with her or tried to do anything. It's a statement she says he made, but of course nothing else came out about that until all these other tumultuous events in their family is going on. Nothing is said about that. It all becomes very convenient. Now, she makes these statements while she's run away. She's got nowhere to live because her family's moved off. She's 15 years old. She makes these statements. It's reported to the police. She then goes back and lives with Mr. Wells and her mother, and once she's back at home and the tumultuous situation is over there is no crisis anymore. The DA drops the case after 11 days of investigation because she's withdrawn her desire to pursue the case.

Six more years pass and we are now in 2003. C.W. has found out the man she believed -- has recently found out that the man she believed to be her biological father, Michael Wells, through her mother, her family, Mr. Wells himself, said was her father is, in fact, not her father. And she told you she felt hurt and she felt betrayed by Michael for that.

.      .      .

To say that she has an unstable family life and environment would be such a gross understatement of what I believe the situation to be you can't even imagine. And that's not C.W.'s fault. It's not her fault that her mom uses alcohol and drugs and comes up to her grandmother like that at work. It's not her fault. But can it affect what she says and what she does? Yeah. Can it make her make some bad decisions without understanding the full consequences because she's acting out of anger and betrayal and hurt? Absolutely, it can.

Defense counsel continues argument by discussing the testimony of L.S.:

Here's what concerns me so much about this case, and if we're talking about three-year-old children or four-year-old children like we were in voir dire, brutally honest and tell you the truth it wouldn't be a concern but we're not talking about that. We're talking about kids hitting teenagedom [sic], puberty. We're talking about kids who come from a situation at home that is obviously not good. But what does L.S. tell us? She says that C.S., R.C. and her talked about all this up in Hugo, Oklahoma, before any report was ever made to the police. Well, we've been told by everybody else making these accusations that the first time any of this is brought up and discuss is C.W. has this outpouring of emotion down in

-6-

College Station to her sister, R.C. L.S. is telling you that's not what happened. That they discussed this up in Hugo, Oklahoma, the three of them together before that ever happened.

. . .

But I think if you think about what L.S. testified to, she said the three of them talked about it before the police were ever notified, before any kind of report was ever made, and the other problem is is [sic] that C.W. says the only time she ever remember R.C. talking to her about what happened to her was when she was about four years old. R.C. told you they talked about it within a year before C.W. made her outcry.

. . .

But think about it, recall what they said, and they've all got different version about when they began talking about this. Now, what do I think? Unfortunately it may have happened. If you've got an older sister and an older cousin who are upset, who are mad about the situation, things that are going on, and they may even have convinced C.W. this happened. I think that's perfectly possible. I think it's perfectly plausible. And now everybody is trying to fill in the blanks of 15 years.

Unfortunately, these events just don't link up with each other very well. The claimed pattern of abuse, the starting and stopping, and not -- nothing happening for six years and starting up again, it just doesn't follow. The only time allegations are made is when there is trouble going on in the family, when there's a crisis. And maybe that's how they deal with it. Maybe that's how focus gets attention back on them. Sometimes people make false wrongful allegations out of spite, and sometime they do it because they don't realize exactly what it's going to cause and the damage they are going to cause and people do get wrongly accused.

Defense counsel also summarized the testimony of Joanna Wells:

[H]er testimony is is [sic] that C.W.'s told her she didn't want to get caught in a lie and that she's got a problem telling the truth. When the police come get you out of class in seventh grade to verify what's been reported and you don't have a parent or anybody else there to talk to you, you wouldn't imagine the pressure to follow through with what has been started.

The extraneous offense evidence was properly admitted to rebut a defensive theory. *See Bass*, 270 S.W.3d at 563. Appellant argues that the extraneous offense was not clearly proven. However, L.S. identified Appellant in court, and testified he tried to put his hands down her

pants.  The statute provides for the admission of other crimes, wrongs, or acts properly proven, thus Appellant's argument fails.  TEX.R.EVID. 404(b).

Appellant next argues that the prejudicial impact of the evidence outweighs its probative value.  In determining whether the prejudicial effect of the evidence substantially outweighs its probative value, the court looks at how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, the extraneous offense's potential to impress the jury in some irrational but indelible way, the trial time needed to develop the evidence, and the proponent's need for the extraneous offense evidence.  *Wheeler*, 67 S.W.3d at 888.  The testimony of L.S. depicts an event similar to those testified to by R.C. and C.W., which makes their testimony of the assaults much more probable.  It also makes defense's theory of fabrication less probable.  While certainly any sexual assault, especially one on a minor, has the potential to impress the jury in some irrational and indelible way, we cannot say L.S.'s testimony of an attempted touching had that effect on the jury.  The direct and cross-examination of L.S. was extremely short in duration encompassing only six pages out of hundreds of pages of the trial record.  Finally, the State needed the evidence to rebut Appellant's defensive theory of fabrication and frame-up, which was promulgated in opening statements, on cross-examination, during the defense's case-in-chief, and during closing arguments.  We find the trial court did not abuse its discretion in admitting the evidence.

Having overruled all of Appellant's issues, we affirm the conviction and the judgment.


April 23, 2009

DAVID WELLINGTON CHEW, Chief Justice


-8-

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J. (Not Participating)

(Do Not Publish)