

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00001-CR

_____

TYVON GULLATT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 18F-0176-102

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

A Bowie County jury convicted Tyvon Gullatt of murdering Carlos Clark. In this appeal, Gullatt argues that the trial court erred in ruling that he had opened the door to extraneous-offense evidence and in overruling his objection to the timeliness of the State's disclosure of extraneous-offense evidence. After reviewing the record and applicable law, we find that Gullatt opened the door to the extraneous-offense evidence and that he received sufficient notice of that evidence. We affirm the trial court's judgment and sentence.

## I.     Evidence and Testimony

Clark was gambling with his friend Carl Battle late on a Friday night in February 2018 at a place the witnesses identified as "the Sugar Spot." The men left the Sugar Spot and went to a convenience store located on State Line Avenue in Texarkana. The drive-through cashier, Tamela Moore, knew the men and recognized them as they waited in line. According to Moore, the men were sitting in a Nissan Sentra. Battle was driving, and Clark was sitting in the front passenger seat. Moore saw one of the car doors open and a man enter the back seat of the car, but she did not know who the man was. Shortly after the man entered the car, she heard a gunshot.

Battle testified that he and Clark knew Gullatt and that they had seen him earlier that night at the Sugar Spot.[1] As they were waiting in the drive-through line, Gullatt tapped on Battle's window and then got into the back seat. Battle testified that he heard a gun's hammer being cocked. In response to that sound, Battle and Clark scrambled to exit the car. Battle got away and

---

[1] Clark had $6,500.00 on his person. The State suggested through its case-in-chief that Gullatt was attempting to rob Clark.

2

then heard a gunshot. When he returned to the car, Battle observed that Clark was having difficulty breathing.[2] An ambulance arrived shortly thereafter, and Clark was taken to a hospital, where he later died. Prior to his death, Clark stated that Gullatt had shot him.

Moore and the investigating officers reviewed the store's security footage. The recording showed a side of the store which was not visible from the drive-through lane. The video depicted two men arrive in a black Dodge Charger. One man, later identified as Gullatt,[3] got out of the car, walked out of the frame, then ran back to the Charger. The Charger then left the scene. The State however, was not able to obtain a copy of the recording to show the jury.[4] Nevertheless, Sartor testified that based on his review of the surveillance footage, there was no line of sight between Gullatt's vehicle and Clark and Battle's vehicle in the drive-through lane.

After the shooting, Gullatt and his friend Josh Rigsby drove to the home of Gullatt's grandfather, Richard Sanders. Sanders was the only witness called by Gullatt in his defense. Sanders testified that Gullatt told him there had been "a fight, well, more or less like a fight or something or something like that" at the convenience store. Sanders went on to say that it was his understanding that Gullatt had gone to the store to "purchase some weed" from Clark and Battle. Sanders said Gullatt told him "something occurred, and a gun went off, and [Gullatt] was, you

---

[2]Battle admitted at first, upon returning to the car, that he thought Clark was joking about being hurt. There was little to no blood coming from Clark's wound. When he was taken to a local hospital, surgeons removed one kidney and found that Clark's liver was significantly damaged. Clark died at the hospital.

[3]Neither the officers nor Moore were able to identify the man on the recording, but Gullatt later admitted to Investigator Scott Sartor that he was the man in the video who was seen leaving the Charger.

[4]Scott Sartor, the lead investigator, testified that the store's owner would not cooperate with law enforcement, and required a search warrant before he would provide a copy of the recording. By the time a warrant was obtained and the store's recording system obtained, the footage from the night of the murder had been overwritten.

know, crying." Sanders testified that Gullatt told him there was a second gun at the scene. Sanders testified that he told Gullatt to call the police. Sanders continued,

> Because he was, you know, scared, and, you know, said that he got into -- well, he had told me he went to a car to get some weed from the guys, and something happened in there, and he said that his partner had shot him or something or something happened in there, and I told him right then, well, you need to call the police.

The State introduced a recording of Gullatt's 9-1-1 call. During that call, Gullatt said,

> I was on State Line, North State Line, at the Chevron; and a couple guys I know . . . called me to the car. And I was uh . . . fixin' to uh . . . talk to 'em. Or whatever. Can you send an officer out to my house? [Dispatch officer asks for address]. 3902 Main Street. [Dispatch officer asks what happened]. I got in the car and I was proceeding to talk to these guys. But I think he was trying to rob me, and take everything I had. And as he was turning around gun he had went off. And he shot his homeboy . . . don't know where he got shot at or how it happened. But they both got out of the car and ran. I don't know where they're at now or what, but I had left the scene cause they were trying to rob me and I'm on 39th and Main right now. 3902 Main.[5]

Gullatt then gave the dispatcher his cell phone number and told her he would be at the residence at the given address.

Officers arrived at Sanders' house a few minutes later. Sanders signed a consent to search document and then directed the officers to a closet where they found a Springhill 9mm automatic pistol. Through a ballistic analysis, law enforcement concluded that the pistol found in Sanders' closet had fired the bullet found in Clark's body, causing his death, and that it also matched a shell casing found at the crime scene.

---

[5]Gullatt sounded calm on the recording, not excited, agitated, or frightened. He spoke in a steady, conversational tone.

The medical examiner and investigating Officer Spencer Price both testified that they found soot and gunshot residue on Clark's jacket and shirt, and around the entrance wound in his lower right back. These witnesses also testified that the soot and gunshot residue indicated a contact wound, meaning that the pistol was in contact with Clark's clothing over his body when it was fired. Officer Price and Investigator Sartor testified that the evidence supported only one conclusion: that Gullatt left his vehicle, came around the convenience store, entered Battle's vehicle, and shot Clark at an extremely close range.[6]

During direct examination by Gullatt, Sanders said that he felt the incident was "a drug buy gone wrong" and that "at some point in time, the firearm went off." Sanders said he retrieved the pistol from Rigsby, not Gullatt, and that he put the gun in the closet under a hat where police later found it. Gullatt explained to Sanders that the State's indictment alleged Gullatt killed Clark by firing a gun with intent to cause Clark serious bodily injury. Sanders testified that he did not believe that Gullatt was trying to intentionally harm anyone on the night of the killing. Gullatt rested his defense after Sanders finished testifying.

The State then argued to the trial court that Gullatt had introduced the theory of accident into his defense. The State argued that by interjecting that theory into the case, Gullatt had opened the door to the admission of an extraneous aggravated robbery Gullatt allegedly committed about four years prior to Clark's shooting. Over Gullatt's objection, the trial court admitted the evidence.

---

[6]Sartor based his opinion, in part, on Battle's testimony that he and Clark were exiting the vehicle when Gullatt shot. In Sartor's opinion, this explained how a contact bullet wound on Clark's mid-back, on the right side, occurred.

5

To prove this extraneous offense, the State presented testimony from Louis Jaralillo. Jaralillo told the jury of a late-night visit from Gullatt, which occurred about four years before the events of Clark's murder. Jaralillo testified that Gullatt arrived at his house around 1:30 a.m. to wait for Jaralillo's roommate. He stated that he and Gullatt had previously "hung out" together and that he thought nothing of Gullatt coming to his door at such a late hour. However, once he came in, Gullatt and another person assaulted Jaralillo. Jaralillo added that Gullatt held a knife to his throat and told him he would kill him if he called police. Gullatt and his accomplice then stole various items from Jaralillo's apartment.

After considering the evidence, the jury found Gullatt guilty of murder. After the punishment phase ended, the jury assessed a sentence of life imprisonment and a $10,000.00 fine.

## II. The Trial Court Did Not Err In Admitting the Extraneous-Offense Evidence

### A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). A trial court does not abuse its discretion if its evidentiary ruling is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

Extraneous-offense evidence may be admitted to rebut a defensive theory raised in opening statement,[7] cross-examination of State's witnesses,[8] or the defense's case-in-chief.[9] However,

---

[7]*See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

[8]*See Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994).

[9]*See De La Paz v. State*, 279 S.W.3d 336, 345–46 (Tex. Crim. App. 2009); *Rubio v. State*, 607 S.W.2d 498, 501 (Tex. Crim. App. 1980).

merely introducing evidence for "a purpose other than character conformity, or any of the other enumerated purposes in Rule 404(b), does not, in itself, make that evidence admissible." *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996). The extraneous offense must also be relevant to a "fact of consequence" in the case, *id.*; *Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992), and it must be relevant beyond its tendency to prove the character of a person in order to prove conformity therewith. *Montgomery*, 810 S.W.2d at 387.

Extraneous-offense evidence may become admissible where the State's uncontradicted direct evidence "is completely undermined by defense cross-examination." *Albrecht v. State*, 486 S.W.2d 97, 102 (Tex. Crim. App. 1972). "[T]o raise a defensive theory sufficient to open the door to the introduction of extraneous-offense evidence, the cross-examination responses must undermine the State's testimony and effectively place in controversy a fact that testimony was offered to prove." *Smith v. State*, 420 S.W.3d 207, 219–20 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "But a mere denial of commission of an offense generally does not open the door to extraneous offenses . . . ." *De La Paz*, 279 S.W.3d at 343.[10] If, however, the defensive theory is just to point out the lack of direct evidence of the accused's guilt, and "[t]he cross-examination only suggests the possibility that appellant did not commit the offense because no one saw her commit it, thus tangentially challenging the issue of identity," such strategy may "fail[] to undermine the State's case" where the "appellant left the State's circumstantial identification evidence largely untouched." *Clark v. State*, 726 S.W.2d 120, 123 (Tex. Crim. App. 1986).

---

[10]De La Paz argued in his opening statement, and implied in cross-examining State's witnesses, that the two witnesses key to the State's case were fabricating their allegations. Under cross-examination by the State, De La Paz expressly accused those two witnesses of lying. *Id*. at 346.

"Where the testimony of a witness remains unimpeached after cross-examination, the mere fact that the witness was cross-examined does not authorize the state to introduce testimony of extraneous offenses." *Albrecht*, 486 S.W.2d at 102.

### B.  Analysis

Viewed in total, we agree with the trial court that Gullatt opened the door to the extraneous-offense evidence.  To begin with, defense counsel cross-examined firearm and tool-mark expert Nathan Tunnell about his experience with accidental discharges from pistols similar to the one in this case.  Additionally, during opening statement, defense counsel told the jury that after the defensive case-in-chief, they would be better able to decide if the State had "charged [Gullatt] correctly."  Also, when urging a directed verdict after the State rested its case, counsel for Gullatt specifically argued that the State failed to prove beyond a reasonable doubt that Gullatt had the requisite intent to cause serious bodily injury to the victim.  Finally, Sanders testified that it was his understanding, based on his conversations with Gullatt, that (1) "a gun went off," (2) "[Gullatt] went to . . . get some weed from the guys, and something happened in there, and said that his partner had shot him or something or something had happened in there," (3) "at some point in time, the firearm [went] off," and (4) "something went wrong in that car with this attempt to buy marijuana, and the gun discharged."

All of this evidence and argument suggests that either Battle shot Clark or Gullatt's gun accidentally discharged during the course of an illegal drug purchase.  Either of these theories was sufficient to open the door to the State's rebuttal evidence.  *Cf. Austin v. State*, 712 S.W.2d 591, 594 (Tex. App.—Tyler 1986, no pet.) (where defendant told police that the shooting of his wife

8

was an accident, defendant opened the door to evidence of second statement to police suggesting defendant was angry at wife).

## III.    The State's Notice of Extraneous-Offense Evidence Was Not Untimely

Finally, Gullatt asserts that the trial court erred in allowing evidence of extraneous offenses during both the guilt/innocence and punishment phases of trial because the State did not provide timely notice to Gullatt under either Rule 404(b) of the Texas Rules of Evidence or Article 37.07 of the Texas Code of Criminal Procedure. Specifically, he argues that the State only provided notice of its intent to use the extraneous evidence eight days before trial and that eight days is unreasonable under Rule 404(b). Second, he argues that the State's notice under Article 37.07 of the Texas Code of Criminal Procedure was deficient because it did not list the county where the extraneous offenses had occurred. We find that the State's notices were timely.

### A.    Notice Under Rule 404(b) Was Timely

It is true that the State filed an amended notice of intent to offer extraneous-offense evidence on November 20, 2018, eight days before the beginning of testimony. The record also reflects that the State filed a notice of intent to produce extraneous-offense evidence on November 8, 2018, which was twenty days before trial on the merits began. However, the amended notice contained new extraneous offenses not addressed in the original notice. Accordingly, Gullatt argues that the State's notice was untimely under Rule 404(b) of the Texas Rules of Evidence.

With respect to the State's 404(b) notices during the guilt/innocence phase, the State introduced the Jaralillo evidence in rebuttal, not during its case in chief. The State is not required

9

to provide pretrial notice of extraneous-offense evidence offered in rebuttal. *Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002). Moreover, the State did not introduce any extraneous-offense evidence during the guilt/innocence phase of trial, other than the Jaralillo robbery. The State's original 404(b) notice, which Gullatt received twenty days before trial, referenced that offense. Accordingly, even if notice were required, Gullatt received twenty days' notice of that offense.

The State's notices were also timely for use during the punishment phase. Rule 404(b) states:

> Evidence of a crime, wrong, or other act . . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence . . . in its case-in-chief.

TEX. R. EVID. 404(b). "The purpose behind the notice provision of this rule is to adequately make known to the defendant the extraneous offense the State intends to introduce at trial." *Webb v. State*, 36 S.W.3d 164, 176 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citing *Self v. State*, 860 S.W.2d 261, 264 (Tex. App.—Fort Worth 1993, pet. ref'd)). "To be effective, a request under Rule 404(b) 'should be in writing and served on the prosecution.'" *Id.* (citing *Espinosa v. State*, 853 S.W.2d 36, 38 (Tex. Crim. App. 1993)). Nevertheless, "[a] certificate of service creates a presumption that a document properly sent is received by the addressee." *Id.* (citing *Thomas v. Ray*, 889 S.W.2d 237, 238 (Tex. 1994)).

In determining what notice is reasonable, the courts look to the circumstances and timing of the defendant's request for notice as well as the timing of the State's reply. In *Hayden v. State*, the Texas Court of Criminal Appeals held,

The rule requires "reasonable" notice. Whether the delivery of witness statements constitutes reasonable notice depends in part on the timing of that delivery. If the State gave the statements to the defense shortly after receiving the request for notice, the implicit statement is: "These are the extraneous offenses that we intend to offer in the case-in-chief." The longer the time lapse between the receipt of the notice and the delivery of the witness statements, the less likely that the recipient will conclude, "This is the evidence that responds to my request." Because a reasonable conclusion to be drawn when delivery of witness statements follows upon the heels of a timely request for notice, is that the State intends to use the evidence, "reasonable" notice is implicit in the delivery.

*Hayden v. State*, 66 S.W.3d 269, 272 (Tex. Crim. App. 2001).[11] Consequently, in determining whether notice is timely under Rule 404(b), we must consider not only the timing of the State's notice, but also the timing of the defendant's request.[12]

When we consider those factors in this case, we find that the State's notice was reasonable during the punishment phase of trial under Rule 404(b). While the State's amended notice was not filed until eight days before trial, there is nothing in the record establishing when the defense requested notice. There is no certificate of service, no copy of correspondence, or any reference

---

[11]The Texas Court of Criminal Appeals cautioned, however,

> While the State should not be permitted to engage in gamesmanship by finding creative ways to convey "notice" without really informing the defense of its intent to introduce extraneous offenses, the defense should not be permitted to engage in gamesmanship by claiming the notice it received was insufficient when the defense did in fact have actual notice of the State's intent to introduce the extraneous offense in question . . . . What is in the record tends to support the conclusion that the defense did indeed have actual notice of the State's intent to introduce the extraneous offense, and hence, the trial court's decision to admit the evidence is supported by the record and must be upheld.

*Hayden*, 66 S.W.2d at 273 n.16.

[12]Although *Hayden* addressed the question of whether the State's production of witness statements in response to the defense's request for notice under Rule 404(b) satisfied 404(b)'s timely notice provision, other cases make clear that the timing of both the defendant's request and the State's notice are considered in determining whether the State's traditional Rule 404(b) notice was timely. *See Hernandez v. State*, 914 S.W.2d 226, 234 (Tex. App.—Waco 1996, no pet.) (finding that three days' notice was not timely where defendant had requested notice ten months before trial); *but see Self*, 860 S.W.2d at 264 (finding that notice sent eleven days before trial and amended notice sent five days before trial were timely where defendant did not request notice until nineteen days before trial).

in the record to any specific request for notice.  In the absence of any record establishing when Gullatt requested notice under Rule 404(b), we cannot say that eight days' notice was untimely.[13]

**B.      The State's Notice Under Article 37.07 of the Texas Code of Criminal Procedure Was Timely**

Article 37.07, Section 3(g), of the Texas Code of Criminal Procedure states, "On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence."  TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (Supp.).  It goes on to state, "The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice."  *Id*.  As with the Rule 404(b) argument, we do not find any evidence that Gullatt requested notice under Article 37.07, Section 3(g).[14]  In the absence of such information, we cannot find that the State's notices were untimely.

---

[13]It is also notable that at Gullatt's April 4, 2018, arraignment hearing, defense counsel requested that the trial court schedule a bond reduction hearing.  When discussing possible dates for the bond hearing and the witnesses that needed to attend, defense counsel stated, "And then just to be clear, I believe that we have no disagreement about his criminal history.  So we would stipulate to any proffer that the State wanted to offer as relates to his criminal history."  Although this offer to stipulate was made in relation to the bond reduction hearing and not the trial, it is relevant in considering whether eight days' notice was timely.  This statement further supports the trial court's finding that the State's 404(b) notices were timely.

[14]Counsel told the trial court that she had filed pretrial motions and that she thought one had been for Rule 404(b) notice.  However, we find no such request in the record.

12

## IV.     Conclusion

For the foregoing reasons, we affirm the trial court's judgment of conviction and sentence.


Ralph K. Burgess
Justice


Date Submitted:     August 19, 2019
Date Decided:     October 4, 2019

Publish