

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. PD-0494/95-07

### CURTIS LEE BASS, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, HOLCOMB, and COCHRAN, JJ., joined. PRICE, J., concurred.

### O P I N I O N

A jury convicted appellant of two counts of indecency with a child. The State's case rested primarily on the complainant's testimony that appellant molested her on church property where appellant was a pastor and on extraneous-offense evidence that appellant molested two other girls on church property. The court of appeals overturned appellant's conviction deciding that the trial court abused its discretion in admitting the extraneous-offense evidence that appellant molested the two other girls on church property. *See Bass v. State*, 222 S.W.3d 571, 575-78, 580

(Tex.App.–Houston [14th Dist.] 2007). We will reverse.

Immediately after the State made its opening statement, the defense made its opening statement and claimed that the complainant's allegations that appellant molested her were "pure fantasy" and "pure fabrication." The defense further claimed during its opening statement that these allegations were "contrary to [appellant's] character, not worthy of belief."

> [DEFENSE]: You are going to learn quite a bit about Curtis Bass. You are going to hear from people that work with him, people who have spent countless hours with him and what he does. You are going to find out from folks that actually man his office in his 11, 12, 13 years in that church.
>
> What you see, you don't see the wandering eyes. Everybody knows what I am talking about. When somebody tries to walk by, you kind of following them. You don't see the out-of-hand comments. You don't see the character flaws. As a pastor and minister, he is the real deal and the genuine article. And that the things that [the complainant] said are so contrary to his character, not worthy of belief.

The defense also claimed during its opening statement that, to "prop up" the complainant's "scattered, crumbling accusation," the State might "seek to present some other allegations," which the jury could consider only for a "narrow purpose," if it believed these allegations "beyond a reasonable doubt."

> [DEFENSE]: And I guess to prop up this scattered, crumbling accusation, [the State] make (sic) seek to present–I don't know–he may seek to present some other allegations. You will find out some of those are every bit as bizarre as this. You will find out that none of those have been formalized into a criminal accusation of any kind.
>
> * * *
>
> And following the law the Judge tells you, you can hear any type of other matters, but you're required to keep focused on the [complainant's] accusation. You have to believe other matter, first off, beyond a reasonable doubt and for a narrow purpose.

The complainant (S.D.) testified at appellant's July 2005 trial that appellant molested her in his church office in February 1994 and in the church parking lot in June 1994 when the complainant

was 16 years old.  The complainant testified that she decided to make a police report in August 2004, after learning that appellant had a sexual relationship with the complainant's then 22-year-old cousin (L.O.) in January 2004.[1]  The defense attacked the complainant's credibility on cross-examination to support the claim made in its opening statement that her allegations against appellant were "pure fantasy" and "pure fabrication."  For example, the complainant testified on cross-examination that various people to whom she made outcries in the fall of 1994 did not believe her, including her mother, other family members and three educators where she attended school, and that her 1994 allegations that appellant molested her were never "formalized into a criminal accusation of any kind."

After the complainant testified, the trial court permitted the State to present the extraneous-offense evidence during its case-in-chief.[2]  This evidence showed that appellant molested a five-year-old girl in his church office in 1995 or 1996 (the J.P. extraneous offense) and that he molested an eleven-year-old girl in his church office in April 2000 (the R.C. extraneous offense).[3]  This evidence

---

[1]

The evidence of appellant's sexual relationship with the complainant's cousin was more fully developed at the punishment phase of appellant's trial.

[2]

During a hearing on the admissibility of the extraneous-offense evidence, the State claimed that this evidence was admissible for "the limited purpose to show–you know, to rebut the claims that the defense has made regarding [the complainant], her credibility, all the other theories the defense has put out."  The trial court overruled the only objection made by the defense at this hearing that the admission of the extraneous-offense evidence would violate various federal and state constitutional provisions, even though we do note that appellant had previously filed a written motion for an evidentiary hearing to determine the admissibility of extraneous offenses and misconduct under, among other things, TEX. R. EVID. 404(b).

[3]

The court of appeals' opinion states that the R.C. extraneous offense occurred in April of 2002. *See Bass*, 222 S.W.3d at 575.  The record, however, reflects that it occurred in April of 2000.

also showed that, even though outcries were made soon after these extraneous offenses were committed, appellant was never formally charged with anything (even though the police were contacted in connection with the R.C. extraneous offense) until the charges in this case were filed in January 2005.

Immediately after the extraneous-offense evidence was presented, the trial court gave the jury limiting instructions on how it could consider this evidence. After the evidence of the J.P. extraneous offense was presented, the trial court instructed the jury as follows:

> Members of the jury, regarding the testimony concerning the defendant's involvement in another act, you cannot consider such testimony for any purpose unless you first find from the testimony presented beyond a reasonable doubt that the defendant committed these other acts, if any.
>
> Therefore, if the State has not proven the defendant's involvement in those other acts, if any, beyond a reasonable doubt or if you have a reasonable doubt of the defendant's involvement, you shall not consider this testimony for any purpose.
>
> Further, if you find the State has proven the defendant's involvement in these other acts, if any, you may only consider this testimony as it may aid you, if it does, in determining the motive, opportunity, intent, plan and knowledge of the defendant in relation to the offense on trial and you may not consider those other acts for any other purpose. Okay?[4]

---

[4]

The jury charge also contained these limiting instructions. The record reflects that the defense did not make any specific objection that it may have had to these limiting instructions except to generally state that it did not "have a lot of agreement with" them during the hearing on the admissibility of the extraneous-offense evidence.

> [DEFENSE]: But in connection with these limiting matters and certainly not waving (sic) our objection to the same, the defense is requesting a limiting instruction in connection with those [extraneous] matters, limiting instruction being for the narrow purpose and if the law requires the State proffered the Court what their purpose of offering those matters are.
>
> And, secondly, Your Honor, the Court instruct the jury that you can only consider those matters if they believe the same beyond a reasonable doubt. I'm asking the

As part of its case, the defense presented evidence in the form of opinion and reputation testimony that the complainant is not considered to be a truthful person. Appellant also testified and denied committing the charged offenses involving the complainant as well as the J.P. and R.C. extraneous offenses. Appellant also denied having a sexual relationship with the complainant's cousin (L.O.).

Appellant agreed on cross-examination by the State that it did not make much sense that these four women with nothing to gain "popped out of the sky at the same time" and "point[ed] the finger" at him.

> Q. Do you find it coincidental that four separate people of four separate ages on four separate days have all accused you of doing the same thing for, in your words, not for money, not for fame, maybe for humiliation? What else do these folks stand to gain?
>
> A. I don't know sir.
>
>          * * *
>
> Q. Okay. What motive do these girls have, these young women have, other than telling the truth, do they have? Can you think of any?
>
> A. Sir, you have asked me that a good many times. I don't know.
>
>          * * *
>
> Q. All right. And out of sheer coincidence, four of them all pointing the finger at you all popped out of the sky at the same time. Don't make much sense, do it?
>
> A. No, sir, it doesn't.[5]

---

Court instruct the jury not only before each extraneous matter is presented but also after to ensure they fully bracket that off in their jury consideration. So, the Court was gracious enough to actually read to us in chambers 30 minutes ago what your proposed limiting instruction was and I want to tell you, I don't have a lot of agreement with it.

[5] One of appellant's sons testified on cross-examination by the State that it "would be impossible" for "all four of these victims" to get together and make up their allegations against appellant.

Appellant also presented evidence of his good character and reputation for being a truthful person. For example, one of the members of his church (Moser) testified:

> Q. [DEFENSE]: In the 28 years that you have known Curtis Bass, have you come to have knowledge of his reputation for being a truthful person?
>
> A. [MOSER]: Well, I know if he tells you something, you can believe it to be the truth.
>
> Q. And do you know others that know him?
>
> A. Yes, sir.
>
> Q. Do you know his reputation throughout the community for truth and veracity?
>
> A. It's–to me it is impeccable. I don't know of anybody–up until this incident, we have not even had a hint of anybody saying anything derogatory about his character.

During its closing jury arguments, the defense claimed, as it did during its opening statement, that the State propped up the untrustworthy complainant's "bizarre, silly accusation" against appellant with the extraneous-offense evidence and that appellant is "the genuine article as a minister."

> [DEFENSE]: You heard people who know [appellant] and know him well throughout this community say he is honest. There was only one person that came to tell you about [the complainant] and her reputation. That was her cousin, Brian Behanna, her very own flesh and blood. Do you know [the complainant]? Yes, I know her very well. I've known her all my life. You've known her all your life? Yes. Just her

---

> Q. [STATE]: Are you saying that all four of these girls, all four of these victims got together and made this up?
>
> A. I think that would be impossible.
>
> Q. It would be impossible?
>
> A. Because if [R.C.] accused first, then they four didn't get together. And if these all happened at separate times, that really doesn't make any sense to wait all those years and then finally come together.

general reputation, is it good or bad? It is not good.

And when that happens, if they have anybody that believes [the complainant] is an honorable person worthy of belief, what she says is credible that [the State] can line them up, bring them up, let you hear. So, to prop up this bizarre, silly accusation, [the State] also brought you [the J.P. incident].

\* \* \*

But in this case we have also heard a little bit about [appellant]. What we have learned is this man right here, he spends his life from 12:00 to 1:00 every day doing what? He's in prayer. We have heard that [appellant] has the respect of the Houston Police Department. We've heard that [appellant] works side by side with his wife 24/7 in that church. He doesn't have time to be out stalking girls. You saw his two sons. Do those look like two boys raised by some pedophile?

\* \* \*

[Appellant] ain't plastic. [Appellant] is the genuine article as a minister.

The defense also emphasized during its closing jury arguments that the extraneous-offense evidence could not be used to "convict somebody on the basis of some other accusation" but could only be used to aid the jury "in making a decision and determination" on the charged offense involving the complainant.

[DEFENSE]: [The trial court in its instructions] tells you that if somebody–you might have lost sight of in this case–last time I checked, [appellant] is accused of doing something to [the complainant], not to [R.C.] and not to [J.P.]. [The trial court] tells you specifically in here that that's where your focus is to be, what you focus on, what this case is about.

[The trial court] tells you three times yesterday and again this morning as set out on page 3 here: If there is some kind of accusation, maybe some of you might think, gosh, [J.P.] seemed like a nice little girl, [R.C.] seemed like a nice little girl and, gosh, maybe something happened. I don't necessarily believe that something happened to [the complainant], but, gosh, [R.C.], what Judge Price tells you is you can't go convict somebody on the basis of some other accusation. You can only use it if it helps you in making a decision and determination. It specifically says that on page 3 in each of the sets of instructions.

During its closing jury arguments, the State argued that, in order to acquit appellant, the jury would have to believe that the complainant, R.C., J.P. and L.O. all independently falsely accused appellant for no apparent reason. The State argued that the only reason that these four people would

accuse appellant is that they were telling the truth.

> [STATE]: What you have to believe is that four people have come in here or four allegations have been made and that all those people have lied.
>
> * * *
>
> [Appellant's] own son said, I don't see how it is possible for all those four people to have gotten together. I don't see how it's possible.
>
> At the very least, you knew that in 1994, this man was confronted with somebody who said that he had molested them, [the complainant]. At the very least, you know in 2000, a completely separate person who has no contact, no knowledge, no relationship with [the complainant], [R.C.] in 2000, she made a shockingly similar allegation at the very least. It doesn't happen. It doesn't happen.
>
> * * *
>
> No motive. No reason for these people to come in here and tell you, except for one: That it is the truth. It is the hard, painful truth that this man sitting here betrayed their trust. He betrayed the trust of his congregation. He betrayed the trust of the people who believed in him. And most sadly of all, he betrayed the trust of children.
>
> * * *
>
> There is no reason for you to have heard what you have heard and the pain that obviously it cost them to tell you that. There is no other reason than that it is the truth, that this man is guilty of indecency.

On direct appeal, appellant claimed that the extraneous-offense evidence involving J.P. and R.C. was inadmissible under Rule 404(b), because this evidence was offered (and could only have been used) solely for a character-conformity purpose.[6] We understand the court of appeals to have decided that the trial court abused its discretion to admit this extraneous-offense evidence to rebut appellant's "fabrication" defense even though this evidence would have been admissible to rebut a "frame-up" or a "retaliation" defense. *See Bass*, 222 S.W.3d at 575-78. We exercised our

---

[6] Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

discretionary authority to review this decision. The three grounds upon which we granted review state:

> 1. Was the State entitled to rebut Appellant's "fabrication defensive theory" with specific instances of extraneous misconduct that tended to show the victim did not "fabricate" her account of [appellant's] crimes?
>
> 2. Is there, as the Court of Appeals claims, a meaningful distinction between "frame-up" and "retaliation" defensive theories and a "fabrication" defensive theory?
>
> 3. Did [appellant's] sweeping comments in his opening statement that he could not have committed the offense because he was a minister and had impeccable character authorize the State to introduce evidence of extraneous bad acts to rebut that claim?

Concerning the court of appeals' distinction between a "fabrication" defense (extraneous offenses inadmissible) and a "frame-up" or a "retaliation" defense (extraneous offenses admissible), the State argues:

> The court below acknowledged that this Court has found extraneous offense evidence admissible to rebut defensive theories of "frame-up" and "retaliation." It noted that frame-up and retaliation theories both "include an implication of fabrication," but held that they are not "the same." It appears to have concluded that there is an important distinction because frame-up and retaliation theories, unlike a "mere" fabrication theory, contain an element of motive on the part of the alleged victim to fabricate her claims. This analysis fails to appreciate the basis of the admissibility of such evidence.
>
> Extraneous offense evidence is admissible if it has some logical relevance aside from character conformity. In frame-up and retaliation cases, it is certainly true that proof of an extraneous offense might tend to disprove the defense allegation that the victim has some motive to fabricate her claims. But this is simply one way that the evidence tends to show that the allegations were not fabricated.
>
> It seems obvious that, if the State can show that a defendant has committed similar sexual assaults against unrelated and unconnected children, an affirmative defense allegation that the victim [of the charged offense] fabricated her claims is less likely to be true. By showing that the victim's allegations are less likely to be fabricated, the evidence directly rebuts the defensive claims and has logical relevance aside from character conformity.

(Citations to authorities and parentheticals omitted).

We agree. Our case law supports a decision that a defense opening statement, like that made in this case, opens the door to the admission of extraneous-offense evidence, like that admitted in this case, to rebut the defensive theory presented in the defense opening statement. *See Powell v. State*, 63 S.W.3d 435, 438-40 (Tex.Cr.App. 2001) (in prosecution for indecency with a child, defendant's opening statement that he lacked opportunity to molest the complainant under the circumstances of the charged offense opened the door to admission of extraneous-offense evidence that defendant molested others under almost identical circumstances to rebut defendant's lack of opportunity defensive theory); *see also Daggett v. State*, 187 S.W.3d 444, 453-54 (Tex.Cr.App. 2005) (in prosecution for sexual assault of child under seventeen, defendant's sweeping direct-examination testimony disavowing any sexual misconduct with minors opened the door to admission of extraneous-offense evidence of defendant's sexual misconduct with another minor to rebut this sweeping testimony).[7] This case law makes no categorical distinctions between "fabrication" defenses and "frame-up" or "retaliation" defenses.[8]

---

[7]

Although a defensive opening statement is not itself evidence, it does inform the jury of "the nature of the defenses relied upon and the facts expected to be proved in their support." *See* Article 36.01(a)(5), TEX. CODE CRIM. PROC.; *Norton v. State*, 564 S.W.2d 714, 717-18 (Tex.Cr.App. 1978). When, as here, the defense chooses to make its opening statement immediately after the State's opening statement, the State may reasonably rely on this defensive opening statement as to what evidence the defense intends to present and rebut this anticipated defensive evidence during its case-in-chief as opposed to waiting until rebuttal. *See* Article 36.01(b), TEX. CODE CRIM. PROC., (permitting defensive opening statement immediately after State's opening statement). We also note that the defense in this case presented evidence to support its opening statement. *See Daggett*, 187 S.W.3d at 453-54 (if extraneous-offense evidence is improperly admitted during State's case-in-chief, this error may be cured by defendant's subsequent testimony which opens the door to this extraneous-offense evidence in rebuttal).

[8]

The issue does not necessarily turn on the type of defense presented, but on whether the

In this case, it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory that the complainant fabricated her allegations against him and of rebutting the defensive theory clearly suggesting that appellant, as a "real deal" and "genuine" pastor, would not engage in the type of conduct alleged in the indictment. *See Daggett*, 187 S.W.3d at 453-54; *Powell*, 63 S.W.3d at 438. It is subject to reasonable disagreement whether this extraneous-offense evidence made these defensive theories less probable. *See id.*; *Montgomery*, 810 S.W.2d at 387. The trial court, therefore, did not abuse its discretion to decide that the extraneous-offense evidence was admissible to rebut these defensive theories.[9]

The judgment of the court of appeals is reversed, and the case is remanded there for further proceedings consistent with this opinion.

Hervey, J.

Delivered: September 10, 2008
Publish

---

extraneous-offense evidence has noncharacter-conformity relevance by, for example, rebutting a defensive theory or making less probable defensive evidence that undermines an elemental fact. *See Powell*, 63 S.W.3d at 438; *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Cr.App. 1990) (op. on reh'g).

[9] The State also argues that the extraneous-offense evidence was admissible as substantive evidence of appellant's guilt under the "doctrine of chances." *See, e.g., Casey v. State*, 215 S.W.3d 870, 880-81 (Tex.Cr.App. 2007); *Robbins v. State*, 88 S.W.3d 256, 265-69 (Tex.Cr.App. 2002) (Cochran, J., concurring in the judgment). We did not grant discretionary review on this issue and, therefore, do not address it. We also express no opinion on whether the trial court's unobjected-to limiting instructions limited the jury's consideration of the extraneous-offense evidence to its proper purposes. *See Dagett*, 187 S.W.3d at 454-55.