# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00504-CR

---

**Jonathan Dwight Fillmore, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
NO. CR2019-368, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Jonathan Dwight Fillmore of one count of continuous family violence (Count I) and two counts of aggravated sexual assault (Counts II and III). *See* Tex. Penal Code §§ 22.021, 25.11. The trial court assessed punishment at 10 years in prison for Count I, 40 for Count II, and 40 for Count III, rendering judgment accordingly. In four appellate issues, Fillmore maintains that (1) the court should have excluded certain extraneous-act evidence, (2) it should have granted a mistrial, (3) its assessments of court costs should be overturned, and (4) the evidence was insufficient to support the counts of aggravated sexual assault. We modify the court's judgments of conviction to delete two of the three assessments of $290 for court costs, modify the clerk's record Bill of Cost accordingly, and affirm the judgments as modified.

## BACKGROUND

Fillmore and the complainant lived together and had been in a dating relationship for some time. After a night out drinking with friends in October 2018, they got into an argument back home. It quickly escalated into a physical fight. Fillmore pushed the complainant into a stove, injuring her ribs; shoved her onto their bed with enough force that her knee bloodied her nose; and demanded sex. Later, Fillmore again pushed her onto the bed, pinned her down, applied pressure to her neck, and allegedly vaginally and anally sexually assaulted her. During the assault, he squeezed her neck until she couldn't breathe, urinated on herself, and at some point blacked out. Afterwards, the complainant begged Fillmore to take her to the hospital because she was in so much pain, but he refused. The complainant stayed at their home that night and did not seek medical attention on her own.

In the days that followed, Fillmore went on a work trip, and the complainant left the state for her uncle's funeral. They exchanged several texts, with the complainant confronting Fillmore about the sexual assault and him acknowledging and apologizing for it. She also took pictures of injuries on her body from the attack but did not then report it to law enforcement.

When the complainant returned from her trip, she lived with Fillmore until February 14, 2019. The evening before, Fillmore went through the complainant's phone while she slept and found that she had contacted an ex-boyfriend, a police officer, for advice on how to leave the relationship. Fillmore woke the complainant up, threw her phone at her, and pushed her. He drank a great deal of wine and fought with her all night long. Early on the morning of the 14th, she left for work, earlier than usual. He texted her constantly throughout the day. When her workday ended and she eventually returned home, he again confronted her about her ex-boyfriend. He threw a cellphone at her so hard that it caused a scrape and large bruise on her hip.

2

The complainant knew she needed to get out of the house, so she went to a neighbor's house. The neighbor helped her call 911. Officers soon arrived to question the complainant and Fillmore separately. Also, the police department's crime-victim liaison spoke with the complainant and gave her a form to fill out about Fillmore and what he has done to her. After the complainant spoke with a detective and the district attorney's office, Fillmore was indicted for Counts I, II, and III here. Count I for continuous family violence relied on alleged assaultive acts from both October 2018 and February 2019, and Counts II and III relied on the alleged aggravated sexual assault in October 2018.

During the guilt–innocence jury trial, Fillmore testified and admitted to Count I. But he maintained that he never sexually assaulted the complainant and would never do so. The jury returned conviction verdicts on all three counts, and the court rendered judgment and sentence as set forth above. Fillmore now appeals his three judgments of conviction.

## DISCUSSION

### I. The trial court did not abuse its discretion by admitting evidence of an extraneous attempted sexual assault because the evidence rebutted a defense fabrication theory.

In his first issue, Fillmore maintains that the trial court should have excluded both testimony by his ex-wife and a video exhibit regarding an alleged sexual assault by Fillmore on her similar to his alleged conduct against the complainant. Fillmore argues that the ex-wife's testimony and video should have been excluded under either Rule of Evidence 404(b)(1), as inadmissible extraneous-act evidence of character, or Rule 403.

We review a trial court's decision to admit evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion only if its decision is beyond the "zone of reasonable disagreement." *Gonzalez v. State*,

3

544 S.W.3d 363, 370 (Tex. Crim. App. 2018). Review must focus on the record before the trial court when it admitted the evidence. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). We must affirm the court on any legal theory supported by the record. *Id.*

### A. Rule 404(b) and rebutting defensive theories of fabrication

In the trial court and on appeal, both sides dispute whether the evidence was properly admitted to rebut a defensive theory that the complainant was fabricating her allegations and testimony. Although Rule 404(b)(1) requires excluding extraneous-act evidence much of the time, Rule 404(b)(2) allows admitting extraneous-act evidence when the evidence rebuts a defensive theory of fabrication. *See Bass v. State*, 270 S.W.3d 557, 562–63 (Tex. Crim. App. 2008); *Sandoval v. State*, 409 S.W.3d 259, 301 (Tex. App.—Austin 2013, no pet.).

The defense may raise this theory in one or more ways, including in opening statement or in cross-examining State witnesses. *See Bass*, 270 S.W.3d at 563; *Gaytan v. State*, 331 S.W.3d 218, 224 (Tex. App.—Austin 2011, pet. ref'd). Defense cross-examination opens the door to extraneous-act rebuttal evidence on fabrication when the record before the trial court allows it to reasonably believe that the defense—whether explicitly or implicitly—has alleged that the complainant is lying. *See De La Paz v. State*, 279 S.W.3d 336, 346–47 (Tex. Crim. App. 2009); *Klein v. State*, 273 S.W.3d 297, 314 (Tex. Crim. App. 2008). The court when deciding whether to admit the rebuttal evidence may consider "not only the words spoken on cross-examination, but its tone, tenor, and nonverbal cues." *See Hammons v. State*, 239 S.W.3d 798, 808 (Tex. Crim. App. 2007).

Here, the defense cross-examinations of the complainant and other State witnesses raised a defensive theory of fabrication, opening the door to the ex-wife's later testimony and

4

video. Defense counsel cross-examined the complainant about whether she lied when she filled out a danger-assessment form for the police department's crime-victim liaison:

> Q. All right. And did you fill it out fairly—fair and accurate that day?
>
> A. No.
>
> Q. So you lied in the assessment?
>
> A. I was scared.
>
> Q. So you lied when you did the danger assessment?
>
> A. Maybe. I don't even remember the—each question that was on there, to be honest.
>
> Q. OK. Well, I'm asking you, did you answer everything honestly?
>
> A. There was one question I believe I did not. I was scared to answer it.
>
>  . . . .
>
> Q. OK. So you told the truth about everything except one thing?
>
> A. I guess. I don't remember. I'm sorry.
>
> Q. Do you recall being asked that "Has he," meaning Mr. Fillmore, "ever forced you to have sex when you did not wish to do so"?
>
> A. Maybe. Again, I don't remember. I remember writing yes and noes, but I—I was so . . . nervous that day.

Further cross-examination suggested that the complainant both fabricated her answer on the form and started lying after she spoke with the district attorney's office:

> Q. How did you answer, ma'am?
>
> A. I answered no. I put an "N."
>
> Q. No, that he has never—he has never forced you to have sex when you did not wish to do so. And, in fact, you didn't tell the cops about it, either, because it never

happened. And isn't it true that it was later, around March 5th, that you went and talked to the DA's office? Right?

A. Yes, sir.

. . . .

Q. And at that point, then your story changed, didn't it?

A. It did.

Separately, defense counsel asked the detective, "And, yet, you still believe 100 percent [the complainant] was telling the truth . . . and not Mr. Fillmore?"

The defense's other questions that implied fabrication[1] included suggestions that:

(1) the neighbor who helped the complainant call 911 was "just assuming things" about what Fillmore had done because the neighbor had seen nothing herself,

(2) the complainant had only "supposed injuries" because she did not take a picture of her swollen finger despite otherwise enjoying taking pictures of herself,

(3) she did not tell her mother about the sexual assault,

(4) her bruises could have been caused not by Fillmore but by her job dealing with large animals,

(5) her testimony about receiving many texts from Fillmore was wrong and she was instead texting her ex-boyfriend who was soon to be her husband,

(6) her mother advised her to get someone on her side to "influence things,"

(7) her mother never asked her about her bruises, and

(8) she never saw a doctor for the injuries.

---

[1] *See Hammons v. State*, 239 S.W.3d 798, 808 (Tex. Crim. App. 2007) (lines of questioning so subtle as to suggest only "sinister seed of innuendo" may "c[o]me to full fruition" as fabrication charge when viewed in light of other defense efforts at trial).

Also, during a bench conference about the complainant's text messages, defense counsel argued that the texts needed to be admitted into evidence because of the complainant's "[m]otive . . . into why she all of a sudden changed her story."

Given all this, we conclude that the trial court did not abuse its discretion when it determined that the door was opened to the evidence from the ex-wife. *See Bass*, 270 S.W.3d at 563; *De La Paz*, 279 S.W.3d at 346–47; *Webb v. State*, 575 S.W.3d 905, 909–10 (Tex. App.—Waco 2019, pet. ref'd).[2] We thus overrule this portion of Fillmore's first issue.

### B.      Rule 403

Fillmore next argues that the ex-wife's evidence was so unfairly prejudicial as to be inadmissible under Rule 403.  Under that rule, if the probative value of relevant evidence is substantially outweighed by certain dangers, then the evidence is inadmissible. *Gonzalez*, 544 S.W.3d at 371.  The dangers include "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."  Tex. R. Evid. 403.  Unfair prejudice "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).  The rule calls for a balancing test, under which the analysis includes, but

---

[2] Fillmore tries to distinguish *Bass* because the defense effort charging fabrication in that case was an opening statement while here the defense made no opening statement. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).  That purported distinction does not keep *Bass*'s principles from applying here—in fact, *Bass* suggests that its principles should apply with even greater force to the presentation of the evidence, like cross-examination, as compared to opening statements, which are not evidence. *See id.* at 563 n.7.

need not be limited to, four factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019). Rule 403 balancing "is always slanted" in favor of admissibility. *De La Paz*, 279 S.W.3d at 343. The slant is acute in "he said, she said" sexual-assault trials, where Rule 403 should be used only sparingly to exclude "relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant." *See Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009).

Here, because none of the four factors favors exclusion, the trial court did not abuse its discretion by admitting the ex-wife's evidence.

For the first factor—the evidence's probative force—the Court of Criminal Appeals has instructed that probative value is "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item." *Davis*, 329 S.W.3d at 806. This factor favors admitting the evidence here because the ex-wife's account bore notable similarities to the complainant's. *See Gaytan*, 331 S.W.3d at 227. Fillmore himself testified that the two accounts were "[f]or the most part" similar. In each, Fillmore asked the woman to have sex; after each woman refused, he put the woman onto a bed; he pinned the woman down, restraining her from getting up; the clothes covering each woman's sexual organ were removed; he put the woman's legs back; and he went to put his penis into the woman's vagina. The evidence from the ex-wife was like the evidence from the complainant, so the first Rule 403 factor favors admission. *See id.*; *Grider v. State*, 69 S.W.3d 681, 688–89 (Tex. App.—Texarkana 2002, no pet.).

The second factor—irrational, indelible impression—does not favor exclusion because of how the jury charge conditioned the jurors' potential consideration of extraneous-act evidence. *See Gaytan*, 331 S.W.3d at 227–28. The jury charge said that the jurors (a) could not consider extraneous-act evidence unless they believed beyond a reasonable doubt that Fillmore had committed the extraneous acts and (b) could consider the extraneous acts only as an aid, if the evidence was any aid, in determining Fillmore's intent, motive, plan, absence of accident or mistake or in "rebut[ting] a defensive theory in relation to the offense on trial." We presume that the jury followed these instructions. *See Harris v. State*, 572 S.W.3d 325, 334 (Tex. App.—Austin 2019, no pet.) (citing *Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011)).

The third factor—the time needed to develop the evidence—does not favor exclusion either. The number of pages of the reporter's record comprising the guilt–innocence phase beginning when the jury was present each day is about 388 pages. Of that number, the State took up only about 26 pages' worth of time to develop the evidence. This is not so long a period as to tip this factor in favor of exclusion. *See Gaytan*, 331 S.W.3d at 228.

The fourth factor—the State's need for the evidence—strongly favors admission. Because no one else was present for the alleged assaultive acts, much of the case came down to the complainant's word against Fillmore's. It was one of Fillmore's trial strategies to charge her with fabricating the allegations. And indeed, Fillmore, in his arguments under another of his appellate issues, notes that "the defense in this case asserted that a large part of the case centered on the complainant's credibility" and that the complainant's "credibility was in issue" because she "admitted that she had 'changed her story' and 'lied' about the sexual assault." The State thus needed the extraneous-act evidence, so this factor strongly favors admission. *See id.* at 227.

9

With none of the four factors favoring exclusion, we overrule this last portion of Fillmore's first issue.

**II.      The trial court did not abuse its discretion by denying a mistrial because the record shows that there was no "residual prejudice" for a mistrial to cure.**

In his second issue, Fillmore maintains that the trial court should have granted his motion for a mistrial. He moved for it during his case-in-chief, complaining of a Michael Morton Act error by the State's failure to disclose a handwritten statement by the complainant until the defense case-in-chief.

During cross-examination of the complainant, defense counsel elicited information about a handwritten statement that the complainant had given to investigators. Earlier in the trial, some of the testimony had referred to a typed affidavit that the complainant had signed. But the handwritten statement, defense counsel elicited, was made before the typed affidavit.

After the testimony revealing the handwritten statement, defense counsel asked for a bench conference and alerted the court that the statement had not been disclosed despite a defense request for discovery material. The State quickly retrieved the statement and gave it to the defense. The court gave defense counsel an extended lunch break to review it.

After the lunch break, the court offered the defense some curative steps. It offered defense counsel a voir-dire examination of the complainant outside the presence of the jury and a second chance to cross-examine the complainant before the jury. The voir-dire examination took place that day. The court also offered to give the jury curative instructions, in response to defense counsel's suggestion that cross-examining the complainant for the second time could be seen by the jury as his "trying to do something defense attorney style." The defense did not take the court up on its offer of curative instructions. And the court, although it denied defense counsel's request

10

to strike all the complainant's testimony, gave defense counsel, at counsel's request, a continuance until the next day to keep reviewing the handwritten statement and consider strategy.

Both sides returned for trial the next day and offered more argument about the late disclosure. Defense counsel announced ready to proceed but also moved for a mistrial, which the court denied. Defense counsel then cross-examined the complainant for the second time.

We review the denial of a mistrial for an abuse of discretion. *Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016). A mistrial is unavailable when no "residual prejudice remains" for the mistrial to cure "after less drastic alternatives have been explored." *Id.*; *accord Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009).[3] This rule has been used across many contexts in which the defendant sought a mistrial. *See, e.g.*, *Lee v. State*, 549 S.W.3d 138, 145–46 (Tex. Crim. App. 2018) (complaint of improper statements during State's opening statement and direct examination of witnesses); *Jenkins*, 493 S.W.3d at 609, 612–13 (complaint of Article 36.22 juror misconduct); *Barnett v. State*, 161 S.W.3d 128, 133–34 (Tex. App.—Fort Worth 2005) (complaint that trial court coerced jurors), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006). Importantly here, the rule has been used in the review of appellate issues about requested mistrials for (a) untimely disclosure of discovery material, *see Hernandez v. State*, 610 S.W.3d 106, 113 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd); *see also Kulow v. State*, 524 S.W.3d 383, 388 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("When favorable evidence is not concealed but disclosed untimely, a defendant bears the burden to show that the delay resulted in prejudice. . . . Prejudice is not shown where the information is disclosed in time for the defendant to make effective use of it at trial." (internal citation omitted)), and (b) Michael

---

[3] Fillmore's own appellate briefing references this rule: "[A mistrial] is required only in extreme circumstances in which the prejudice is incurable."

11

Morton Act errors, *see Foyt v. State*, 602 S.W.3d 23, 49–50 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd).

This rule controls this case about alleged Michael Morton Act late disclosure because the record shows that there was no "residual prejudice" for the requested mistrial to cure. *See Ocon*, 284 S.W.3d at 888. The trial court offered curative instructions, granted the extended lunch break and the continuance, and allowed defense counsel to cross-examine the complainant using the handwritten statement. The sources of prejudice that Fillmore identifies in his appellate briefing are that he would have conducted voir dire differently, changed his theme of the case, and cross-examined the complainant differently, all to emphasize the issue of witness credibility, and that his second chance at cross-examining the complainant could be seen by the jury "as a nefarious defensive ploy."

But the record shows that all these asserted sources of prejudice were cured or were curable by means less drastic than a mistrial. First, defense counsel's voir dire of the venire panel did in fact raise witness credibility several times, showing a lack of prejudice there. He broached the topic before the panel and asked them, "[W]hat are the types of things that you would be looking for as a juror to say, 'Hey, this person is credible,' or 'Maybe this person isn't credible?'" One venireperson answered that "[c]ontinuity of story, truth, history of that" would help determine witness credibility, and one venireperson later said, "Consistency in their statement would be the credibility mark for me." Defense counsel also suggested to the panel that not reporting an alleged instance of violence could introduce reasonable doubt about the alleged violence. Two venirepersons added that inconsistencies in complainants' statements about what happened to them was one reason there could be reasonable doubt:

[Defense counsel]: OK.  So what's some other things that could be reasonable doubt other than one witness?

 . . . .

Venireperson: That there's—that they don't—well, their—their story isn't the same from the first time they started talking and someone else is asking, but it changes.

[Defense counsel]: OK.  So inconsistencies, right?

Venireperson:  Yes.

[Defense counsel]: In their statements?

Venireperson: Correct.

[Defense counsel]: OK.  25?

Venireperson: That's exactly what I was going to say.

Soon after, counsel connected the concepts of reasonable doubt, witness credibility, and he-said-she-said competing testimony, and some of the venire agreed with his points:

[Defense counsel]: What's some instances that you can think of that might be reasonable doubt in an aggravated-sexual-assault-type case?

 . . . .

[Defense counsel]: OK.  And what would—what would reasonable doubt look like, though, in that—in a case like that?

 . . . .

Venireperson: If she didn't say no.

Venireperson: If she didn't say no.  Yeah.

[Defense counsel]: OK.

Venireperson: Because that—

[Defense counsel]: So it goes back to witness credibility, right?

13

Venireperson: Right.

[Defense counsel]: Because a lot of times in cases of this nature, there's only two people in the situation, right?

Venireperson: Right.

[Defense counsel]: So witness credibility—

Venireperson: His word against hers, more or less.

[Defense counsel]: Witness credibility is big, right? What about you, Mr. Rodriguez? Anything come to mind?

Venireperson: Those are—those are tough situations. The ones I've been in, I would say a lot of times it's other evidence that comes forward discrediting—

[Defense counsel]: OK.

Venireperson: —the person accusing, is typically how—how's that—how that's worked in the past.

[Defense counsel]: OK.

Venireperson: But with a he-said-she-said, no one around, it's difficult.

In two later instances, members of the panel raised on their own the importance of discrediting witnesses' credibility. In all, the defense voir dire did in fact raise the witness-credibility topics that Fillmore on appeal says were lacking and thus a source of prejudice requiring a mistrial. The record therefor shows that there was no prejudice from the late disclosure of the handwritten statement that caused the voir dire in retrospect to have been lacking.

Similarly, the record shows that defense counsel's cross-examinations did emphasize witness credibility. We detailed under the previous appellate issue the ways that the defense sought to undermine State's witnesses' credibility, particularly the complainant's, by raising fabrication. Fabrication aside, other of defense counsel's lines of questioning raised

14

witness credibility as an important issue. Counsel questioned the complainant's neighbor about whether the complainant gets agitated or emotional very easily. Counsel elicited from both an officer who had reported to the scene and the detective that the complainant never mentioned any sexual assault. Finally, counsel cross-examined the detective about how it was the district attorney's office that had prepared the complainant's typed affidavit for her. These lines of questioning plus those detailed above about fabrication show that there was no prejudice from the late disclosure that caused defense counsel's cross-examinations in retrospect to have been lacking.

Next, defense counsel's chance for a second cross-examination of the complainant, using the handwritten statement, helped the defense emphasize witness credibility. It gave the defense every opportunity to use the late-disclosed statement to undermine the complainant's credibility. The trial court's offer of this second chance at cross-examination thus cured much of the prejudice that could have stemmed from the late disclosure.

Finally, curative instructions would have cured any prejudice in the jury's seeing the second cross-examination "as a nefarious defensive ploy," as Fillmore refers to it. Though the trial court offered curative instructions, the defense did not take the court up on the offer.

In all then, the record shows that there was no "residual prejudice" that a mistrial was needed to cure. *See Jenkins*, 493 S.W.3d at 612; *Ocon*, 284 S.W.3d at 888. The trial court thus did not abuse its discretion in denying a mistrial. We overrule Fillmore's second issue.

## III.   We modify the record to reflect total court costs of $290.00.

In his third issue, Fillmore makes two distinct challenges to the court costs assessed against him. He first maintains that the court costs assessed in his three judgments of conviction must be overturned in their entirety. Each judgment independently assesses $290 in court costs.

15

Fillmore's first challenge depends on a separate Bill of Cost in the clerk's record, which recites that the "[t]otal costs assessed in this case for the Clerk's Record is $0." His position is that because this Bill of Cost does not reflect the $290 assessments of court costs in the judgments, all three assessments must be overturned under Code of Criminal Procedure article 103.001(b), which provides that "a cost is not payable by the person charged with the cost until" there is a written bill of cost that complies with the statute. But as the State points out, the Court of Criminal Appeals has explained how Article 103.001 operates, and its explanation is that the statute controls not when costs may be *assessed* in the first place but only whether and when costs already assessed may be *collected*. *See Johnson v. State*, 423 S.W.3d 385, 394–96 (Tex. Crim. App. 2014). We agree with the State and thus overrule this portion of Fillmore's third issue, which focuses on whether the judgments may assess the $290 amounts in court costs.

In the rest of this issue, Fillmore asks that we modify two of the judgments to delete their $290 assessments, leaving only one judgment with a $290 assessment, because the amount of court costs may be assessed against him only once, under Code of Criminal Procedure article 102.073(a). The State concedes this point. Under our modification authority to correct the record, and in line with what the State requests in its brief, we modify the judgments for Counts I and II so that their assessments of court costs are now $0.00, leaving untouched the $290 assessment in the judgment for Count III, and we modify the clerk's record Bill of Cost to include the statement "The total assessed for court costs in this case is $290.00." *See* Tex. R. App. P. 43.2(b) (modification authority); *Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013) (same); *Tharp v. State*, __ S.W.3d __, 2024 WL 2309211, at *18 (Tex. App.—Austin May 22, 2024, no pet. h.) (modifications like those here).

16

**IV.** **The evidence was sufficient to support the aggravated sexual assaults, contrary to Fillmore's arguments that the complainant's testimony needed corroboration and that all the evidence supported nothing more than speculation.**

In his fourth issue, Fillmore maintains that the evidence was insufficient to support his conviction for the two counts of aggravated sexual assault. In one portion of this issue, he argues that the complainant's testimony needed corroboration before it could support conviction verdicts, and in the other, he lays out why he thinks that the evidence all told—and especially the complainant's testimony—supports no more than mere speculation that he committed the offenses.

For his corroboration argument, Fillmore relies on only *Winfrey v. State*, but that case is distinguishable. *See generally* 393 S.W.3d 763 (Tex. Crim. App. 2013). There, the Court of Criminal Appeals conducted a legal-sufficiency review of the evidence supporting a capital-murder conviction. *Id.* at 767–73. It held that the evidence was legally insufficient and rendered an acquittal. *Id.* at 772–73, 774. The evidence that the State put forward consisted of "dog-scent lineup evidence" and six items of corroborating evidence to support the result of the dog-scent lineup. *See id.* at 769–71. The Court reviewed all that evidence together and held it to be legally insufficient. *See id.* at 769–73. In doing so, the Court set forth the rule that because dog-scent-lineup evidence is "merely supportive" of the rest of the evidence in any trial, dog-scent-lineup evidence "cannot itself constitute sufficient evidence of guilt." *Id.* at 770.

The complainant's testimony here is distinguishable from dog-scent-lineup evidence. Hers is the testimony of a victim of an alleged aggravated sexual assault who reported it within a year of the assault's occurrence—the testimony thus needs no corroboration to support a conviction. *See* Tex. Code Crim. Proc. art. 38.07(a); *see also Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) ("[Victim's] testimony, standing alone, is sufficient evidence of penetration. . . . [Her] identification of appellant as the man who raped her is sufficient." (internal

17

citations omitted)); *Beltran v. State*, 517 S.W.3d 243, 250 (Tex. App.—San Antonio 2017, no pet.) ("S.O.'s testimony alone is sufficient to establish the elements of the offense of sexual assault for which the jury found Beltran guilty."); *Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("The testimony of a victim[,] standing alone, . . . is sufficient to support a conviction for sexual assault." (quoting *Ruiz v. State*, 891 S.W.2d 302, 304 (Tex. App.—San Antonio 1994, pet. ref'd))).

We turn now to the standard of review applicable to Fillmore's argument for evidence insufficiency that the evidence here gave rise to nothing more than speculation that he committed the charged aggravated sexual assaults. The State must adduce "proof sufficient to persuade a rational trier of fact beyond a reasonable doubt of every fact necessary to constitute the offense." *Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024). "Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt." *Id.* But a "mere modicum" of evidence is legally insufficient. *See id.* (quoting *McGinn v. State*, 961 S.W.2d 161, 168 (Tex. Crim. App. 1998)). Also insufficient is evidence that gives rise to nothing more than speculation that the defendant committed the charged conduct: "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). Evidence-sufficiency review thus involves "not whether there was *any* evidence to support a conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." *Baltimore*, 689 S.W.3d at 340.

In our review, we "consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt." *Id.* at 341. It is the factfinder's role to fairly resolve conflicts in the testimony; to weigh the evidence; to draw reasonable inferences from basic facts to ultimate facts; and to judge the credibility of witnesses, meaning that the factfinder may find credible all, some, or none of the testimony that any witness gives. *See id.*; *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020). The factfinder may "draw reasonable inferences from the evidence presented at trial, so long as each inference is supported by the evidence produced at trial." *Baltimore*, 689 S.W.3d at 342. When drawing those inferences, it "may use common sense, common knowledge, personal experience, and observations from life." *Id.* But it may not "come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Id.* On appeal, we "consider the cumulative force of all evidence to determine whether the evidence was sufficient to establish each element of the offense." *Id.* at 341.

We take the elements as they are "defined by a hypothetically correct jury charge" for the case. *Id.* "A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* "The law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations." *Id.* A person commits an aggravated sexual assault if the person intentionally or knowingly causes the penetration of the anus or sexual organ of the victim by any means, without the victim's consent, and if the person

by acts or words places the victim in fear that death or serious bodily injury will be inflicted on the victim.  *See* Tex. Penal Code § 22.021(a)(1)(A)(i), (2)(A)(ii).

Here, five sources of evidence, and the reasonable inferences that they give rise to, together support a conclusion that the evidence was sufficient to support conviction on the two counts of aggravated sexual assault.

The first source is the complainant's testimony.  She testified that during an attack by Fillmore, Fillmore put his penis in her vagina and in her anus, each without her consent, including her telling him to get off her.  She also testified that the attack included his putting his hand on her neck with enough force that she blacked out from inability to breathe, causing her to fear that he would kill her or cause her serious bodily injury.

The second source is Fillmore's admissions via text acknowledging and apologizing for the assaultive acts.  In one of the text exchanges, after the complainant texted Fillmore both "I can't believe all of this is because of sex" and "You forced yourself in me so much," Fillmore responded: "Baby I just let my stress build up inside me so much and then it ends up coming out on you when I drink to[o] much!  I'm very sorry I never wanted to hurt you."  Not long after, when the complainant texted, "Forcing to have se[x] twice and you forced into my butt," Fillmore responded, "I know baby I'm sorry."  Later that day, the complainant texted: "Do you remember my face?  Blood gushing down my face… crying in pain…. being forced to have sex… and being choked out where I thought I'd not wake up…."  Fillmore responded, "Yes baby it's eating me alive."  And similarly:

> [The complainant]: When I was about to black out, you weren't even looking at me to see what state I was in.  All you cared about was shoving your dick in me.  I tried to grab your ball sac[k] to get your hand off but the. [sic] You held my hands down and choked me harder.  I felt my face turning purple.

20

[Fillmore]: I know what happened baby trust me I feel horrible and I want to kill my self for doing that to you.

A few days later, the complainant asked: "Could you not have [th]ought about that before choking me out? Forcing yourself inside me? Hurting me? Throwing me? Making me wish I was dead?" And Fillmore responded, "I wish I had but I didn't have a clear mind with the alcohol."

The third source of evidence is a set of photos of the complainant's injuries from Fillmore's attack. They show bruises on the complainant's body and red spots on her eyes resulting from being choked.

The fourth source is a nurse practitioner's testimony that when she was treating the complainant, the complainant reported being strangled by Fillmore to unconsciousness and "sexual[] penetrat[ion] vaginally and rectally."

The fifth source is the extraneous-act evidence from Fillmore's ex-wife about his attempted sexual assault on her, which bore notable similarities with the complainant's testimony. As we noted above, this evidence helped rebut the defensive theory of fabrication. It also helped rebut the defense's suggestion that the complainant had in fact consented to the sexual contact. For example, defense counsel cross-examined the complainant based on her having consensual sex with Fillmore on occasions after the alleged aggravated sexual assaults. The extraneous-act evidence thus made it more likely that Fillmore had committed the alleged aggravated sexual assaults on the complainant because those acts were like the ones committed against the ex-wife. *See Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.) (stating that defensive theory putting consent in issue in prosecution for sexual assault necessarily also puts in issue defendant's requisite mental state for offense and that "[w]hen the defendant's intent to commit

the offense charged is at issue, the relevance of an extraneous offense derives from the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all").

All these sources of evidence, and the reasonable inferences that they give rise to, allowed the jury to conclude beyond a reasonable doubt that all the elements of the charged offenses of aggravated sexual assault were proven. *See* Tex. Penal Code § 22.021(a)(1)(A)(i), (2)(A)(ii); *Baltimore*, 689 S.W.3d at 340–42. We thus overrule Fillmore's final issue.

## CONCLUSION

We modify the trial court's judgments for Counts I and II so that their assessments of court costs are now $0.00, and we modify the clerk's record Bill of Cost to include the statement "The total assessed for court costs in this case is $290.00." We affirm the Count I and II judgments as we have modified them and affirm the Count III judgment as it stands.

_____

Chari L. Kelly, Justice

Before Justices Baker, Kelly, and Smith

Modified and, as Modified, Affirmed

Filed: July 31, 2024

Do Not Publish