

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-24-00189-CR
No. 02-24-00191-CR

---

LOGAN MYLES ROBINSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court Nos. 1824235, 1824236

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

## I. Introduction

Appellant Logan Myles Robinson was charged with several family-violence offenses involving his wife, B.W., and his stepson, D.L.[1] In B.W.'s case, the State alleged that Robinson had (1) intentionally, knowingly, or recklessly caused bodily injury to her by impeding her breath by using his hand to apply pressure on her throat or neck; and (2) intentionally or knowingly caused bodily injury to her by striking her with his hand. Both counts were enhanced by a January 2009 family-violence conviction to which Robinson stipulated at trial.

In D.L.'s case, the State alleged that Robinson had (1) intentionally or knowingly caused bodily injury to D.L. by impeding D.L.'s breath by using his hand to apply pressure to D.L.'s throat or neck; (2) intentionally or knowingly caused bodily injury to D.L. by striking him with his hand; and (3) intentionally or knowingly caused bodily injury to D.L., a child younger than 15, by striking him with his hand. The first two counts were enhanced by the January 2009 family-violence conviction.

At trial, the State waived the first count involving D.L. Robinson pled not guilty. During the State's case, the trial court gave the jury an oral limiting instruction on extraneous-offense testimony by Robinson's ex-wife, offered by the State to rebut the defense's theory of fabrication, and included that instruction in the jury charges.

---

[1]We use initials to protect the privacy of D.L., a minor. *See* Tex. R. App. P. 9.10(a)(3), 9.8 cmt.

The jury found Robinson guilty of the two counts involving D.L. and sentenced him to 10 years' confinement and a $5,000 fine for each count. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A) (assault), § 22.04(f) (injury to a child); *see also id.* § 12.34 (stating third-degree punishment range). The jury acquitted Robinson of the first count involving B.W. but found him guilty of the other count and assessed the same punishment as in D.L.'s case. *See id.* §§ 12.34, 22.01(b)(2)(A). The trial court gave credit for time served for the fines and set the sentences to run concurrently.

In a single issue, Robinson complains that the trial court abused its discretion under Rule of Evidence 403 by admitting his ex-wife's testimony to buttress the complainants' "fragile, equivocal, and inconsistent testimony." He asserts that this evidence "served as a verdict-defining, tipping point in the trial" and converted the trial "into an unfair referendum on whether [he] was, simply, a bad person based on a one-sided view of all his life's mistakes." Because the trial court did not abuse its discretion by admitting this evidence, we overrule Robinson's single issue and affirm the trial court's judgments.

## II. Discussion

We will set out the context relevant to the trial court's decision to admit the evidence over Robinson's Rule 403 objection after explaining the standard of review and applicable law.

## A. Standard of review and applicable law

We review the trial court's decision to admit evidence, as well as its decision as to whether the evidence's probative value was substantially outweighed by the danger of unfair prejudice, for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

Relevant evidence is that which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* at 736–37 (citing Tex. R. Evid. 401). Evidence does not need to prove or disprove a particular fact by itself to be relevant under Rule 401; it is sufficient if the evidence provides even a small nudge toward proving or disproving a fact of consequence. *Hall v. State*, 663 S.W.3d 15, 31 (Tex. Crim. App. 2021).

Rule 403, a rule of judicial economy, "excludes otherwise relevant evidence when the costs of admission outweigh its utility." *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024). Under Rule 403, the trial court may exclude relevant evidence if its probative value "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence over its exclusion, *Hall*, 663 S.W.3d at 34, so evidence should only be excluded when a clear disparity exists between its

probative value and its unfair prejudice, *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

### 1. Probative value

Probative value considers the closeness in time and similarities between the extraneous and charged offenses. *Payne v. State*, No. 02-17-00268-CR, 2019 WL 2223575, at *2 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication) (holding that previous assault of same victim three months before charged offense rebutted consent). Remoteness can significantly lessen probative value because, "[l]ogically, the passage of time allows things and people to change." *West v. State*, 554 S.W.3d 234, 239 (Tex. App.—Houston [14th Dist.] 2018, no pet.). However, remoteness alone does not require exclusion—instead, it is an aspect of probative value that the trial court is to consider along with the other Rule 403 factors. *Id.* at 239–40. And although remoteness weighs in favor of exclusion, strong similarity between the charged offense and extraneous acts exerts an inherent probative force strongly serving to make more or less probable the existence of a fact of consequence. *Id.* at 240 (stating that convictions for the same act around 30 years earlier were still strongly probative).

Further, a defense opening statement alleging fabrication "opens the door to the admission of extraneous-offense evidence . . . to rebut the defensive theory." *Bass v. State*, 270 S.W.3d 557, 557–58, 563 (Tex. Crim. App. 2008). Evidence of prior similar behavior makes it less likely that a complainant has fabricated a charged

offense, and the State has strong need for extraneous-offense evidence when no one witnessed the charged offenses, the complainant's injuries are not evident, and the complainant's credibility is at issue. *James v. State*, 623 S.W.3d 533, 548 (Tex. App.—Fort Worth 2021, no pet.) (concluding that extraneous-offense evidence was, among other things, probative to rebut the defense theory of fabrication and that the State's need was strong because no one witnessed the charged offense, the complainant had no evident injuries, and her credibility was at issue); *cf. Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (comparing a he-said-she-said single-victim case to one in which five complainants testified about the same behavior, thereby making the admission of 9,000 pornographic images unfairly prejudicial).

### 2. Unfair prejudice

"Unfair prejudice" does not simply mean that the evidence will injure or prejudice the opponent's case—that is, after all, the central point in offering evidence. *Davis*, 329 S.W.3d at 806. The "unfair prejudice" question asks whether the evidence tends to suggest a decision on an improper, usually emotional, basis. *Hart*, 688 S.W.3d at 894; *see Upchurch v. State*, 656 S.W.3d 170, 180 (Tex. App.—Fort Worth 2022, no pet.). And a limiting instruction can only go so far in that it "only lessens the tendency of the evidence to suggest decision on an improper basis; it does not make that tendency go away entirely." *Upchurch*, 656 S.W.3d at 180–81.

**B. Context**

The record reflects that Robinson's trial theory was fabrication by B.W. and D.L.

### 1. Voir dire and opening statements

During voir dire, Robinson's defense counsel asked the venire panel: "Can anyone think why somebody might not be completely honest on the stand?" "Maybe because they have a certain motive? . . . Anybody else have any ideas why someone might not be completely honest? And I'm not saying they're lying." When one of the potential jurors suggested fear or retaliation, defense counsel then asked, "Anyone else have any idea why someone might not be completely honest?"

During opening statements, after the prosecutor predicted that the State would show how Robinson's alcohol use fueled anger and family violence, the defense countered that B.W. and D.L. had been tired of supporting Robinson and sought the easiest way to get rid of him—and to keep all of the marital property—by accusing him of assault and having him arrested and prosecuted.

### 2. The State's case

D.L., B.W., the responding officer, and a nurse testified in the trial's first day. The first three witnesses' focus was on D.L.'s and B.W.'s accounts. The nurse's testimony pertained to B.W.'s appearance that night and whether it might have been caused by strangulation or by alcohol use. The next day, Robinson stipulated to his

2009 family-violence conviction, and his ex-wife testified about the extraneous offenses.

### a. D.L.'s testimony and related evidence

D.L., who—at age fifteen—was a six-foot, two-inch-tall, ninth-grade football player, testified that he had hit a growth spurt before trial. Robinson and B.W. married when he was twelve. He and Robinson got along at first but sometimes Robinson would "get a little rough" when they would play wrestle, pinching or punching D.L. to the point that B.W. would have to break it up; they never called the police. When the family moved to Burleson, Robinson became verbally abusive of D.L., calling him names.

On April 20, 2022, the family went to a bar, where B.W. and Robinson drank beer and did shots. D.L. testified that things escalated when Robinson and B.W. drank alcohol.

Upon arriving home from the bar, D.L. was told to clean the kennels of the bulldogs they were raising; the kennels were in the dining room, which was next to the kitchen. When Robinson inspected and then criticized D.L.'s cleaning, D.L. made a smart remark in response, and Robinson "smacked [him] with an open hand." This angered B.W., who tried to stop him; her intervention angered Robinson. D.L. told Robinson, "I don't want you here anymore," further angering him.

B.W. placed herself between Robinson and D.L., and Robinson shoved her to the ground and started punching her in the face. B.W. managed to get up, and she and

8

D.L. ran to her bedroom and locked the door. Robinson then started kicking down the door.

Robinson had broken the door in half when D.L. reached into the bin where they kept his grandfather's gun, grabbed the gun, and loaded it.[2] By the time he pointed the gun at Robinson and said, "Please stop, sir," Robinson was inside the room, and B.W. was unconscious on the floor.[3] Robinson walked up to him, put his hand on the gun, and punched D.L. in the face with a closed fist. D.L. held onto the gun as he fell; they struggled over it; and Robinson gouged D.L.'s eyes,[4] making him relinquish the gun.[5] B.W., who had regained consciousness, told D.L. to get her phone and run.

D.L. took B.W.'s phone and ran, and Robinson chased him. As he ran, D.L. dialed 911. The jury listened to the nine-minute 911 recording in which D.L. told the

---

[2]During cross-examination, when asked about his statement in a Child Protective Services (CPS) interview a week after the incident that he had retrieved the gun from Robinson's clothing in the closet, D.L. stated that he did not recall saying that. B.W. also did not recall telling the CPS worker this.

[3]During his direct examination, D.L. recalled seeing Robinson choke B.W. after pushing her, stating, "[H]e put his two hands around her neck and started to choke her." During cross-examination, D.L. stated that Robinson had choked B.W. twice that night—first in the kitchen and then in the bedroom.

[4]During cross-examination, D.L. agreed that he did not write in his statement that Robinson had gouged his eyes.

[5]The gun was never found; the trial court admitted State's Exhibit 44—a gun matching its description—as a demonstrative exhibit.

9

operator that his stepfather "keeps punching [his] mom in the face and hitting [him]," that he grabbed a gun for self-defense, and that Robinson took the gun away and aimed it at him.[6]

D.L. described Robinson in response to the operator's questions but broke off to announce, "He's running after me!" D.L. told the operator that he was running down the street, that his mother had locked Robinson out, and that Robinson was very intoxicated. When asked if B.W. needed an ambulance, D.L. said that he did not know but that Robinson had hit her "pretty hard"—three times, he thought—and when asked if he needed an ambulance, D.L. recounted that Robinson had "jammed his finger in [D.L.'s] eye" so he could not really see and that Robinson had punched him four or five times. D.L. then alerted the operator that Robinson had gotten into his gray Subaru.

D.L. headed home when the operator informed him that the police had arrived. D.L. asked the operator if he would be in trouble for pulling out the gun, told her that he had his mother's phone because she had told him to run, and told her that he was glad Robinson had been caught because Robinson had "literally broke down the [bedroom] door." When the operator asked for his age, D.L. replied, "I'm almost fourteen."

---

[6]During cross-examination, when asked if he recalled Robinson's aiming the gun at him, D.L. replied, "No, sir." On redirect, D.L. agreed that his memory would have been fresher right after it happened.

10

When the operator asked D.L. why Robinson had behaved this way, he replied, "Because after he started yelling, and he started hitting me, my mom told him to get out and that always gets him mad, and he's had a bunch of alcohol," specifically beer and tequila. D.L. told her that they had gone to the bar at 9 p.m. and returned home at 1 a.m., and when asked whether he had school the next day, D.L. said, "No, ma'am, I don't go to school."[7]

The jury also viewed a recording from a neighbor's Ring camera, which had recorded D.L.'s flight and Robinson's pursuit, and State's Exhibits 3–27, photos taken by the police that night of the home and of D.L.'s appearance. State's Exhibits 7–17 show the bedroom door ripped from its hinges and on its side, a crack in the door's middle, and the door's handle on the floor. State's Exhibits 18–27 show D.L. with minor injuries to his face and his arm. One photo shows a scratch near D.L.'s eye that D.L. attributed to Robinson's fingernail. When asked by the prosecutor if he recalled writing in his statement that Robinson had choked him, D.L. stated that he had reviewed his statement but did not recall if that had happened.

During cross-examination, D.L. agreed that when B.W. drinks alcohol, she turns red on her chest, neck, and face, and he said that she had been intoxicated that night. He also agreed that B.W. had carried the household financially. On redirect,

---

[7]During cross-examination, D.L. stated that it was normal for the family to go to a bar that late and that he had been home-schooled at the time.

when asked, "Did you and your mom fabricate this master plan to get [Robinson] out of the house," he replied, "No, sir."

### b. B.W.'s testimony and related evidence

B.W. and Robinson met in 2006, dated in 2006 and 2007, rekindled their relationship in 2017, and married in 2021. By trial, she had filed for divorce.

B.W. covered the household expenses because Robinson had a hard time finding and keeping work. B.W. claimed that the only time they argued "was when it came to him keeping a job" but that when they argued, Robinson would get very heated, use a very loud, aggressive voice, and belittle her, telling her that she "would be nothing but a bartender" while he would "always be a million[-]dollar man."

B.W. recounted an earlier occasion when Robinson had put his hands on her, stating that when they had lived in an RV on his parents' property while waiting to close on their home in Burleson, Robinson had gotten angry and had knocked her over by pushing her with both hands against her chest. She could not recall what had angered him, said that it had not escalated, and said that they did not call the police. His parents let her and D.L. stay in the house after that.

B.W. said that at the beginning, Robinson's relationship with her son had been good but that as D.L. aged, Robinson became more aggressive with him, and their wrestling stopped being "fun wrestling." Robinson "would put [D.L.] in a choke hold at lot towards the end," D.L. would complain about his roughness, and B.W. would

12

ask Robinson to stop. The escalation concerned her, but she never called the police because he always stopped.

On April 21, 2022, the family had gone to dinner, and she and Robinson each had more than one drink. When they arrived home, D.L. cleaned the kennels. Robinson began to yell at D.L. after he inspected them.

B.W. explained that D.L., who was protective of her, had a "smart mouth" that gave rise on many occasions to conflict in his relationship with Robinson. That night, as Robinson yelled at D.L., he "said something to [Robinson] that made him even more mad." Then Robinson slapped D.L.

B.W. heard the slap from the adjacent kitchen and told Robinson to leave the house, "and then he turned around and started hitting on [her]," mostly her face and head. She hit her head, and the next thing she recalled was seeing D.L. try to pull Robinson off her. When D.L. succeeded, they ran down the hall to the bedroom and shut and locked the door, "thinking just like all the other times he would just leave [them] alone." Instead, Robinson broke the door in half and knocked it off its hinges.

B.W. testified that once Robinson was in the room, he pinned her down and choked her with both hands around her neck, causing her to pass out. When she regained consciousness, she saw Robinson and D.L. fighting over her father's gun. She yelled at D.L. to grab her phone, run, and call 911. D.L. did so, and Robinson chased him.

By the time the police arrived, B.W. said that she had felt "[b]ruised everywhere," could not really think, and assumed she was concussed. The trial court admitted State's Exhibits 29–38, photos of her injuries that night taken by the police. The trial court also admitted, as State's Exhibits 39–43, B.W.'s photos of bruising that showed up later. The photos from that night showed that her face and neck that night were extremely red. The photos that she took later showed bruises on her arms and legs but contained no images of her face or neck.

B.W. described her neck as having been very red and "eventually bruised" and said that she had a sore throat, headache, and nausea for several days after the assault. She acknowledged that her neck reddened sometimes from anxiety but said that the redness in the photo was more than her normal redness level. During cross-examination, she agreed that she sometimes turned red from drinking alcohol, but despite failing to recall how many drinks she had that night, she insisted that "[i]t wasn't a lot" because she had driven home. She also observed, "I'm red right now and I haven't been drinking."

B.W. did not go back to work for a week after the assault, stating that her mouth had been almost swollen shut; she had also lost her voice for a few days. She said, "As soon as I was able to get around and move better, I packed [Robinson's vehicle] up with all of his belongings and took [it] to his parents' house." B.W. said there was nothing in their relationship before that night that would have caused her to pack up his belongings and that she had done so in response to that night's events.

14

During cross-examination, B.W. recalled a sheriff's deputy interviewing her that night but did not recall what was said. Specifically, she did not recall:

- telling the deputy that she was "Irish Indian" and always red;

- telling him that Robinson was not jealous and not a problem drinker;

- saying no when he asked her if she had ever lost consciousness;

- telling him that Robinson had choked her for two seconds; or

- telling him that Robinson had choked her with one hand.

During cross-examination, when asked if Robinson had ever choked her before that night, B.W. said, "No." Defense counsel then asked whether she had considered Robinson to be controlling, and she said, "Yes," but agreed that if she had told the deputy that night that Robinson was not controlling, that statement would be inconsistent with her testimony. B.W. stated that Robinson had never threatened her with a weapon and denied that she had ever told him that she wanted him out of her life or for him to leave.

Regarding her May 2022 divorce petition, supported by her affidavit, which was not admitted into evidence, B.W. agreed that she did not state in the affidavit that she had been choked to unconsciousness or that Robinson had choked and repeatedly punched D.L. and that she did not mention the gun. She agreed that she was seeking all of the marital property, but on redirect, she denied that she had lied to get the

15

marital property, denied that she had asked D.L. to lie,[8] and insisted that her testimony was true.

At the end of B.W.'s testimony, the trial court gave the jury a limiting instruction, restricting the jury's consideration of "wrongful act[s] or acts not charged in the indictment" to "the nature of the relationship between the defendant," B.W., and D.L. and cautioning the jury that it could not consider the acts—if the jury found them true beyond a reasonable doubt—to prove that Robinson was a bad person and thus likely to have committed the charged offenses and that to consider the acts for any purpose beyond the specific, limited purpose would be improper.

### c. Lieutenant Michael Morris

Lieutenant Michael Morris of the Tarrant County Sheriff's Office was dispatched to a domestic-disturbance call at 1:15 a.m. on April 21, 2022. He did not go to the call's address first because the alleged assailant had left the scene in a gray Subaru; he initiated a stop when he saw the Subaru. No gun was found in the vehicle.

Lieutenant Morris then spoke with B.W. and D.L. B.W. was "very disheveled and upset." She kept clearing her throat, and her neck and face were red. D.L.'s face

---

[8]During D.L.'s cross-examination, defense counsel briefly asked him about another man in B.W.'s life, Luke McKibben. During B.W.'s testimony, she stated that she had met McKibben on the night of the offenses. Defense counsel then sought to admit additional evidence about McKibben to show B.W.'s motive to fabricate, stating that it showed that "she's moving on because she has found somebody else." When the trial court questioned the relationship's relevance to whether Robinson had committed the family-violence offenses, defense counsel opted to move on.

was also red and swollen, particularly his right eye. With B.W.'s cooperation, officers filled out a family-violence packet, which is completed when there is any kind of family-violence offense and may include written statements. B.W. did not write a statement, but D.L. did. Both B.W. and D.L. reported that Robinson had assaulted them, and Robinson was arrested.

During cross-examination, defense counsel asked the lieutenant if he had noticed B.W.'s having any difficulty talking with him because she could not move her jaw. He replied, "No." When asked if he recalled B.W.'s having been intoxicated, he replied, "No, not that I could tell." He described B.W. and D.L. as able to understand everything he talked to them about but noted that B.W. had problems recalling what had happened, so D.L. had to tell him. He stated that D.L. had become emotional, going "back and for[th] between angry, upset, sad, worried about his mother."

### d. Mary Ann Contreras

Mary Ann Contreras, a nurse who had taught courses about intimate partner violence, explained that strangulation is external pressure on the outside of the neck cutting off blood flow—and oxygen—to the brain and can also cause pressure on the larynx or windpipe. She stated, "[I]n about half of all cases of external strangulation, including those that do not survive, about half of those people do not have any external marks." Symptoms associated with strangulation include sore throat, ringing in the ears, headache, confusion, a feeling of not getting enough air, vision changes, and memory loss.

On cross-examination, Contreras testified that "alcohol flush" refers "to the redness that a person can experience when they ingest alcohol"—the dilation of vessels under the skin's superficial layer—and she agreed that it can occur on the chest, neck, and face. She also agreed that a person can suffer headache, nausea, confusion, or memory loss from ingesting a lot of alcohol. Upon reviewing State's Exhibits 37 and 38—photos of B.W.'s red face and neck—Contreras stated the redness was consistent with alcohol flush or strangulation.

### e. Angela Fowler (voir dire)

Outside the jury's presence, the State announced that to rebut the defense's fabrication theory, it intended to offer testimony by Angela Fowler, Robinson's ex-wife, about his temper, alcohol use, and a prior assault.

Fowler testified that she met Robinson in 2001, they married in 2002, and over their relationship's course, she learned that he had a temper, that he would get very angry when he drank alcohol, and that when angry, he became "very verbally and physically abusive." As to verbal abuse, he would "cuss at [her]" and call her names. She recounted that when she was five months' pregnant, he went out drinking; they argued when he came home, and he "pushed [her] back up into a wall," starting her contractions. Her brother had interceded. She had to go to the hospital to have her labor stopped. She also testified that they had a "very on-again-off-again relationship due to his drinking and his drug use," and that she went back and forth between their

home and her parents' home because they had a "verbally, mentally, physically abusive relationship."

They split up after the incident with her labor, and when she later went to the hospital to give birth, he became angry because she would not let him be in the room while she delivered their first child. They later had a second child. Fowler testified that she had to be subpoenaed because she was afraid of Robinson and that "it's terrifying being here and if there's going to be any repercussions from this." Fowler identified State's Exhibit 52, a tattoo on Robinson's shoulder that showed her initials and the words "Die slow." Defense counsel had no questions.

At the voir dire's conclusion, the prosecutor argued that, other than Fowler's drug-use mention, the testimony was relevant for the limited purpose of rebutting "the defensive theory that the victims in this case have fabricated their allegations." Defense counsel objected under Rule 403. The trial court overruled the objection, recognizing that the defense had raised the issue of fabrication during voir dire, in its opening statement, and during cross-examination not only of D.L. and B.W. but also of the lieutenant as to their appearance and statements, implying that the complainants had been untruthful. The trial court excluded the tattoo photo under Rule 403.

### f. Stipulation

After Fowler's voir dire testimony, Robinson stipulated to his January 26, 2009 family-violence conviction alleged in the indictments, and the stipulation was published to the jury.

### g. Angela Fowler

Before Fowler testified in front of the jury, the trial court gave the jury a limiting instruction like the one it gave about B.W.'s and D.L.'s testimonies, this time limiting the jury's consideration of the uncharged wrongful acts—if they found them true beyond a reasonable doubt—"to rebut[ting] a defensive theory of fabrication." Following this instruction, Fowler gave essentially the same testimony that she had given during voir dire, adding that she was married to Robinson from 2002 to 2007 and that they had split up in 2005 and that she had been around five months' pregnant—in August or September 2002—when he assaulted her after drinking. During cross-examination, Fowler agreed that the "pushing at the apartment" incident occurred in 2002, more than 20 years before trial.

### 3. Closing arguments

After the trial court read the charge—including the same limiting instructions as before—the prosecutor argued that the evidence, particularly the 911 call and the photos of the kicked-down door and injuries, had proved its allegations despite "very small inconsistencies."

20

Defense counsel argued that D.L. had sounded calm in recounting to 911 what the prosecutor had characterized as his life's "most traumatic event." He also argued that there were inconsistencies in their testimonies about the gun, how many times B.W. was choked, and B.W.'s divorce-petition allegations, and pointed out how much B.W. and D.L. stated they did not recall, as well as the lack of obvious wounds in D.L.'s photos, and B.W.'s testimony that she could barely talk in contrast to the lieutenant's testimony that she had no problem conversing with him.

In rebuttal, the prosecutor argued that the Ring video "shows that man chasing a 13-year-old little boy out of the house," that the 911 call corroborated D.L.'s testimony, and that B.W.'s symptoms—headache, sore throat, memory loss—supported that she had been strangled.

### 4. Jury deliberations

During deliberations, the jury requested "evidence photos, 911 call DVD, ring video. Transcript of 911 call if available, if not then need recorded for [sic] 911 call read back," the family violence packet, the sheriff's statement, and D.L.'s statement. The trial court provided the jury with the photos, 911 call, and Ring video but none of the other items, which were not in evidence. The jury also asked for a transcript of the testimony from B.W. and Lieutenant Morris about B.W.'s being strangled or choked, but the trial court informed the jury that it could not grant the request "as written" and referred the jury to the "Testimony" section of the jury instructions.

21

## C. Application

Robinson challenges the admission of Fowler's testimony based on probative value, the State's need for it, and its potential to inflame, confuse, or distract the jury. He concedes that the undue-delay and needless-cumulative-evidence factors do not weigh against admission.

### 1. Probative value

Robinson contends that the extraneous acts had nominal probative value based on the lack of temporal proximity and similarity with the charged offenses. Specifically, he points out that B.W. was not pregnant when he pushed, struck, and choked her and that, unlike Fowler, neither B.W. nor D.L. testified that he was frequently verbally, mentally, and physically abusive[9] or that they feared retaliation.[10] Robinson contends that "the only commonality between the extraneous matters and the charged offenses was that Robinson had used some type of force against [Fowler], [B.W.], and [D.L.] Otherwise, the matters had nothing in common."

The State responds that because Robinson raised fabrication in his opening statement and continued this theory during B.W.'s cross-examination, the evidence's

---

[9]We infer that the emphasis here is on frequency because D.L. testified that after the family moved to Burleson, Robinson became verbally abusive of him, and B.W. testified that Robinson had started putting D.L. in chokeholds and that when they argued, Robinson would belittle her. Neither testified about how often this verbal, mental, or physical abuse occurred.

[10]Fowler mentioned retaliation only during her voir dire and not before the jury.

22

probative value weighed strongly in favor of admissibility in that Robinson's prior violent behavior towards his ex-wife after a night of drinking "makes more probable that his charged violent behavior towards his current wife and her child after drinking alcohol was not fabricated since both involve wives, intoxication, and violence."

The Court of Criminal Appeals has stated that if it is subject to reasonable disagreement whether the extraneous-offense evidence made a defensive theory of fabrication less probable, then the trial court does not abuse its discretion by deciding it is admissible to rebut that defensive theory. *Bass*, 270 S.W.3d at 563. Further, the requisite degree of similarity is not exacting, and the extraneous conduct need only be sufficiently similar to the charged offense. *See Webb v. State*, 575 S.W.3d 905, 908 (Tex. App.—Waco 2019, pet. ref'd).

The trial court could have reasonably found that despite the twenty-year gap, Robinson's earlier extraneous behavior had significant probative value because of its similarity to the charged behavior—abuse of an intimate partner or family member after drinking—and because it was offered to rebut the defense's charge of fabrication. *See Bass*, 270 S.W.3d at 563; *Webb*, 575 S.W.3d at 910.

### 2. State's need

Robinson contends that the State did not need the evidence because this was not a trial in which the State's proof relied on a single complainant's testimony without corroborating witnesses or other evidence. Specifically, he argues that B.W.'s

and D.L.'s testimonies corroborated each other and that the State had the 911 call and the Ring video.

Here, the parties provided alternate explanations for B.W.'s redness, she testified that the bruises that she photographed herself did not appear until later, and photos of D.L.'s injuries from the night of the incident did not show significant injuries. In the defense's voir dire, opening statement, and cross-examination, B.W.'s and D.L.'s credibility was called into question with the suggestion that they were lying so that B.W. could retain the parties' marital property in their divorce. Thus, although the State's need might not have been as strong as in a case with a single complainant, *see Pawlak*, 420 S.W.3d at 811, the trial court could have reasonably determined that the State had a strong need to rebut the defense's fabrication theory when the credibility of both complainants—a mother and her fifteen-year-old son—was called into question.

### 3. Improper suggestion

Robinson argues that Fowler's testimony about two incidents when he was assaultive or aggressive while she was pregnant was inherently inflammatory and that the trial court's limiting instruction was insufficient to erase that prejudice.

Unfair prejudice may be created by evidence's tendency to prove some adverse fact not properly in issue or to unfairly excite emotions against the defendant. *Upchurch*, 656 S.W.3d at 180. While the trial court here gave the jury repeated instructions limiting their consideration of extraneous-offense evidence, and we must

presume that the jury understood and followed the court's charge absent evidence to the contrary, *see id.*, because abuse of a pregnant woman could have unfairly excited the jury's emotions despite the limiting instructions, this factor favors exclusion.

### 4. Confusion or distraction from main issue

Robinson argues that the extraneous matters "transformed the trial from one focused on a singular incident in time to one focused on whether Robinson had, across decades, been an abusive husband willing to assault even individuals as vulnerable as a pregnant woman—including one who was still so scared of [him] that being at trial was 'terrifying' for her."[11]

The limiting instructions, the jury charge, and the verdict forms made clear to the jury that its job was to determine whether Robinson was guilty of the charged offenses, and B.W.'s and D.L.'s testimonies provided the trial's focus, particularly in light of the defense's theory of fabrication. Thus, the jury's confusion or distraction because of the extraneous-offense testimony was unlikely.[12] *See James*, 623 S.W.3d at 550.

---

[11]Fowler stated this during her voir dire, not before the jury.

[12]The jury's lack of confusion was illustrated by its notes that did not mention Fowler and its acquittal on one of the charges involving B.W. Further, the potential for distraction was more likely to have arisen not from Robinson's abuse of Fowler but rather—if the jurors did the math—from their realization that B.W. had dated Robinson the first time while he and Fowler were still married. Robinson may have actually benefited if the jury became biased against B.W. for dating a married man.

**5. Undue weight**

Robinson argues that "belated, family-violence assault allegations—especially those made decades after their occurrence" are not evidence naturally understood by a jury without expert insight to explain why a victim would wait so long to accuse her abuser. The State responds that Robinson's family-violence history was already before the jury when Fowler testified because he stipulated to his 2009 family-violence conviction before she testified.

This factor favors admission because the extraneous acts were not complex and were sufficiently similar to the charged offenses, the trial court gave limiting instructions on how to consider them, and Robinson's stipulation to the 2009 family-violence conviction made the jury unlikely to give the earlier 2002–2005 instances more weight than that conviction or the evidence of the April 2022 offenses. *See id.*

**6. Disposition of sole issue**

Based on the above, because the majority of the factors (including the two that Robinson conceded) weighed in favor of admission, trial court did not abuse its discretion by admitting Fowler's testimony, *see Hall*, 663 S.W.3d at 34; *Davis*, 329 S.W.3d at 806, and we overrule Robinson's sole issue.

### III. Conclusion

Having overruled Robinson's sole issue, we affirm the trial court's judgments.

26

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 3, 2025